ESTATE OF ELIZABETH SCHULZ RABE, DECEASED, LOIS ELIZABETH RABE SARMAN, AND EDWIN CARL SARMAN, CO-EXECUTORS, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Rabe v. Commissioner
Docket No. 126-72.
United States Tax Court
T.C. Memo 1975-26; 1975 Tax Ct. Memo LEXIS 348; 34 T.C.M. (CCH) 117; T.C.M. (RIA) 750026; February 11, 1975, Filed George W. Abbott, for the petitioners. Lawrence G. Becker, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent *349 determined a deficiency of $1,535,095.73 in the Federal estate tax of the Estate of Elizabeth Schulz Rabe. After concessions by the parties, the issues remaining for our decision are (1) the value on July 11, 1967, of 470.5 acres of land located at Lake Tahoe, Douglas County, Nevada; (2) the value on July 11, 1967, of a one acre portion of this property which the decedent gave to St. Gall's Catholic Church; and (3) whether the estate is entitled to a deduction for executors' fees in excess of the $139,990.55 allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Elizabeth Schulz Rabe (herein called the decedent) died a resident of the State of Nevada on July 11, 1967. Lois Elizabeth Rabe Sarman and Edwin Carl Sarman are the duly appointed, qualified, and acting co-executors of the Estate of Elizabeth Schulz Rabe (hereinafter called the estate). The co-executors resided in Gardnerville, Nevada, when the petition was filed herein. The estate's Federal estate tax return was timely filed with the district director of internal revenue for Nevada. The executors did not elect to value the property included in the estate under *350 Section 2032. [1]
The estate included an irregularly shaped parcel of unimproved land, containing 470.5 acres, located near the southeast corner of Lake Tahoe in Douglas County, Nevada. This parcel, which may be sometimes hereinafter referred to as the "Lake Tahoe property," abutted U.S. Highway 50, approximately 1/4 of a mile north of the intersection of Nevada State Highway 19 (Kingsbury Grade), and approximately 3/4 of a mile north of the California-Nevada State line. Highway 50 traversed the property in a northwesterly-southeasterly direction nearly bisecting it. At the date of decedent's death more than 95 percent of the 252 acres located west of Route 50 was zoned E-2, resort residential, a classification which permitted multiple dwellings as well as resort uses. The remainder was zoned E-1, estates residential, which restricted use to single family dwellings and appurtenances. This parcel sloped gently downward from northeast to southwest, with the exception of a large rocky knoll near its center. The higher elevations consisted of moderately *351 rolling foothills with granitic outcroppings, and were covered with second growth conifers and manzanita. The lower half was gently undulating open meadowland fronting on Kahle Drive and Route 50. Folsom Spring, located on the west right-of-way line of Highway 50 in the southeastern portion of this parcel, flowed in a westerly direction toward Lake Tahoe. The meadow areas were subject to a high water table during the spring and would have required provision for drainage before they could be used for subdivision purposes. This portion of the property had approximately 4,000 feet of frontage on Highway 50, 90 percent of which was zoned E-1, with the remainder zoned E-2. Access was also available from Elk Point Road which passed 1,650 feet through the northwest corner of this parcel. Elk Point Road connected Highway 50 to the Elk Point residential community and Nevada Beach Park on the east shore on Lake Tahoe. Kahle Drive, located on the southern border, allowed access to the meadow portion of this parcel. The frontage on Highway 50 was generally several feet below highway grade, with the southerly 90 percent ranging from grade to ten feet below grade. The remaining frontage, located *352 at the northeast corner of this parcel, consisted of a cut having a maximum height of 14 feet above highway grade. The frontage along Kahle Drive was at or near grade. This parcel had no frontage on Lake Tahoe. However, access to the Lake was available over an easement through Nevada Beach, a Nevada State park and campground operated jointly with the National Park Service, adjacent to the western boundary of this parcel. Portions of the property were approximately five hundred feet from the Lake shore. Nearly 75 percent of the 218.5 acres located east of Route 50 was zoned E-1, with approximately 15 percent zoned E-2, and the remaining 10 percent zoned commercial. This commercial acreage was zoned for gaming, but consisted of extremely rough terrain. Of the 4,500 feet (approximate) of frontage on Route 50, 20 percent was zoned E-2, with less than 5 percent zoned commercial and the remainder zoned E-1. The elevation of this frontage varied from road grade to 10 feet above grade. Access was also available through a 100 foot strip which fronted on Kingsbury Grade where there was some commercial development and a large number of single family residences. Although this portion of *353 the property also had a slope which would provide excellent lake view lots, it was generally more rugged than the western parcel. Only 14 acres of this parcel were meadowland; the remainder was more heavily tree-covered and rocky than the foothills of the western parcel. Several streams ran through this parcel, flowing east to west. The area immediately north of the property was generally residential (single-family) with the exception of the Round Hill Shopping Center, located at the intersection of Elk Point Road and Highway 50 approximately 1/4 mile north of the northern boundary of the subject property. The development south of the property was primarily residential and included multiple family as well as single family housing. The Douglas County Sewer Improvement District's sewage treatment plant had recently been constructed, in part, on relatively low-lying land taken from the northeast corner of this property. The closest existing gaming house was Harvey's Inn (previously known as Caesar's Inn) located a short distance south of the subject property on the west side of Highway 50. The primary gaming activity was located approximately 1/2 mile south of the subject property, *354 near the actual Nevada-California state line, where the Sahara Tahoe, Harvey's, and Harrah's were located. Electricity, natural gas, and telephone service were available at the site. Although the subject property was not part of an existing water district at the date of decedent's death, water lines were in place on Kahle Drive and Route 50. Water could also have been obtained from wells, streams and the Lake. Sewer service was available although the property was not within a sewer district. At the date of the decedent's death the only improvements on the property consisted of an old small wood-frame single-story residence, an old wood-frame barn, and approximately 1-1/4 miles of wire fencing. These improvements had no value at that time. This 470.5 acre parcel had a total assessed value of $889,450 for the year 1966-1967. Records in the Assessors Office showed that taxes totaling $11,416.21 were paid to Douglas County in that year on this property. In its Federal estate tax return filed November 12, 1968, the estate valued the Lake Tahoe property at $3,514,635, or $7,470 per acre, as of the date of decedent's death. The estate gave one acre of the Lake Tahoe property to *355 St. Gall's Catholic Church. In a notice of deficiency dated October 5, 1971, respondent determined that the Lake Tahoe property had a value of $5,940,650, or $12,626 per acre. The respondent also determined, inter alia, that since the 1-acre of land given to St. Gall's Church had not been specifically designated, the estate's deduction was limited to the value of the least valuable acre of the Lake Tahoe property, which respondent valued at $3,500, and further that the executors were entitled only to the fees allowed by state statute (Section 150.020, Nev. Rev. Stat.), since the probate court had made no provision for extraordinary fees. ULTIMATE FINDINGS 1. The value of the Lake Tahoe property on July 11, 1967, was $5,100,000. 2. The value of the one acre of the Lake Tahoe property given to St. Gall's Catholic Church was $10,839.53. OPINION Issue 1 - Value of Lake Tahoe Property
We must first decide the fair market value of 470.5 acres of unimproved real property located in Douglas County, Nevada, near Lake Tahoe, on the date of the decedent's death. This is a question of *356 fact to be determined from the evidence presented. Alvary v. United States, 302 F. 2d 790, 794 (C.A. 2, 1962); Estate of Sallie Houston Henry, 4 T.C. 423, 447 (1944), aff'd 161 F. 2d 574 (C.A. 3, 1947). Petitioner has the burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Since the estate did not make an election under section 2032, the value of decedent's gross estate is to be determined as of July 11, 1967, the date of her death. See Section 2031. Fair market value is defined in section 20.2031-1(b), Estate Tax Regs., as: the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. This regulation also states that value is not to be determined on the basis of a forced sale price and that all relevant facts and elements of value are to be considered in making a determination of fair market value. Valuation *357 is not an exact science, and fair market value cannot be determined with mathematical precision. The matter is a subjective one and requires the exercise of our best judgment under all the circumstances. Morris M. Messing,48 T.C. 502, 512 (1967). [2]
Based upon the stipulation of facts, the exhibits, the testimony of the experts and other witnesses, and relying on that evidence which we deem most persuasive, we have concluded and found as an ultimate fact that the Lake Tahoe property had a fair market value of $5,100,000 on July 11, 1967. We think it would serve no useful purpose to review the evidence in detail, to indicate our agreement or disagreement with *358 each of the experts' opinions and the factors which they weighed in reaching their conclusions or to meticulously record the factors which we considered or the weight accorded each of them, in arriving at our determination of value. Nor is this necessary. See Penn v. Commissioner,219 F. 2d 18, 21 (C.A. 9, 1955). However, some general comments are in order. In the case of vacant, unimproved property the "market data" or "comparable sales" approach is generally the most reliable method of valuation, the rationale being that the marketplace is the best indicator of value, based on the conflicting interests of many buyers and sellers. This in turn is based on the principle of substitution, i.e., that a prudent man will pay no more for a given property than he would for a similar property. This method requires gathering information on sales of property similar to the subject property, then comparing and weighing them to reach a likely value for the land being appraised. At trial, respondent presented only one expert witness. He appraised the Lake Tahoe property at $5,100,000, and respondent conceded that its value did not exceed such amount even though the statutory *359 notice of deficiency had determined a value of $5,940,650. We can find no fault with the value set by respondent's expert, Arthur Reber. His appraisal, which was detailed, complete, and based on the underlying facts, was of considerable help to the Court. In his testimony he substantiated and defended his conclusions well. His market data approach was based upon an examination of sales of property similar to the parcel at issue here. While Mr. Reber could find no substantially similar properties, he considered the differences and similarities between each sale of similar properties and the subject property and made proper adjustments. He placed primary reliance on this method, but double checked his conclusions through a computation based on a subdivision analysis of the property. This latter computation was detailed and utilized the present value of the expected gross return (based on a gross profit of 100 percent on raw land sales), discounted for a ten-year holding period. He used sales prices and development costs based on those of other similar subdivisions in the area. We disagree with petitioner's counsel that this latter method was not proper. First, all the expert witnesses *360 agreed that the highest and best use for the Lake Tahoe property was residential development. A handbook published by the America Institute of Real Estate Appraisers states that this method (the subdivision analysis) is one of four valid procedures for valuing land. See The Appraisal of Real Estate (6th ed., 1973) at pages 135, 142-144. Under the facts of this case it seems the second most proper method available, after the market data approach, and is particularly suited for verification purposes. Second, the Supreme Court of Nevada has held that: A qualified witness should be allowed to testify to the different factors which a well-informed buyer would use in arriving at a price he would pay for the land. Iske v. Metropolitan Utilities District of Omaha,183 Neb. 34, 157 N.W. 2d 887 (1968). The potential income to be derived from the sale of subdivided lots, properly discounted to show present value, is a factor and relevant to a determination of market value, since sophisticated investors make decisions on the basis of income capitalization. [Tacchino v. State Dept. of Highways,508 P. 2d 1212, 1214 (Nev. 1973)]. In addition *361 Mr. Reber's appraised value was supported by the value determined for the probate court by George Empey, a local realtor who later handled the sale of 127.44 acres of the eastern portion of this property. The Empey appraisal valued 470.05 acres at $4,890,573.30. [3]
Since valuation is a matter of opinion, it is not determinable with talismanic precision, and it would be unlikely that two appraisers would arrive at the same value for as large and varied a parcel as we have here. [4] It is our view, however, that Empey's appraisal demonstrates that Reber's appraisal was within the reasonable range of value. Petitioner places a great deal of reliance on the sale in 1969 of 127.44 acres of the eastern portion of the subject property for $1,350,000, or $10,200 per acre. He argues that the property could not have been worth more in 1967 than it sold for in 1969. We disagree. The increasing influence of and restrictions imposed by the Tahoe Regional Planning Agency (TRPA) caused the subject *362 property to decrease in value after decedent's death. In addition, this sale was from the eastern portion of the property which had much rougher terrain, and would command a lower price per acre due to the increased development cost. Moreover, it is a less desirable location than the property to the west of Highway 50, a main thoroughfare. While the sale of a smaller parcel generally has a higher per acre value than a larger parcel, due principally to the larger number of buyers and the shorter holding period required for development and sale, this factor is far outweighed by the other factors we considered. We accorded little weight to the appraisals offered by petitioner. We found William Kimmel's appraisal which determined a value of $3,764,000, or $8,000 per acre, to be objectionable for several reasons. We were not satisfied either with the number (4) or quality of the comparables he selected. Additionally, he made no adjustment for the commercial acreage in the subject property, provided no comparables for the meadowland and other property on the Lake side of Highway 50, which formed the bulk of the property here, and used no other traditional method to verify his estimate *363 of value. The 1965 appraisal of Brice Leggett, which we found objectionable chiefly because it had been made more than 2 years before decedent's death, was also accorded little weight because it contained no double check and because one portion which he valued separately was sold shortly after the appraisal for a sum 25 percent greater than the figure he determined. Despite respondent's objection, we found Leggett's 1965 appraisal to be relevant and not immaterial. But we did weigh it according to its age and based on the facts. However, we find that his other objections, raised at trial and on brief are proper, and we did not give any weight to those documents either because they constitute hearsay or were irrelevant and immaterial to the issue before the Court. Our findings as to the value of the Lake Tahoe property on July 11, 1967, reflects an annual appreciation from the value returned for the date of the death of decedent's husband of 14.6 percent which is in accord with the 12.5 percent average increase in value which Mr. Reber found for acreage properties in the area for the period 1960-1967 considering the subject property's superior location and other unique features. *364 The value returned by petitioner reflects less than a 7 percent rate and was unrealistically low. Issue 2 - Value of One Acre Given to St. Gall's Catholic Church
In his notice of deficiency respondent reduced petitioner's claimed deduction of $7,470, representing the value of one acre of the Lake Tahoe property which had been given to St. Gall's Catholic Church, to $3,500. The reason given for this adjustment was "In view of the lack of designation as to what acre of land was to be given, the value of the gift is limited to that of the least valuable acre." Since the parties have stipulated that the value of this acre is to be the average per acre value assigned to the Lake Tahoe property as a whole, we hold that petitioner is entitled to a deduction of $10,839.53 for this gift. Issue 3 - Executors' Fees
Section 2053(a) permits a deduction for administration expenses "as are allowable by the laws of the jurisdiction… under which the estate is being administered." Section 20.2053-3(a), Estate Tax Regs., limits such expenses to those "actually and necessarily incurred in *365 the administration of the decedent's estate." Section 20.2053-3(b)(1), Estate Tax Regs., limits the deduction for executor's commissions to those which have been actually paid or may reasonably be expected to be paid at the time the estate tax return is filed. This section further provides as follows: If the amount of the commissions has not been fixed by decree of the proper court, the deduction will be allowed on the final audit of the return, to the extent that all three of the following conditions are satisfied: (i) The district director is reasonably satisfied that the commissions claimed will be paid; (ii) The amount claimed as a deduction is within the amount allowable by the laws of the jurisdiction in which the estate is being administered; and (iii) It is in accordance with the usually accepted practice in the jurisdiction to allow such an amount in estates of similar size and character. On July 8, 1971, the co-executors signed a declaration (IRS Form 7721), under penalty of perjury, which stated that attorney's fees of $329,500 and executors' fees of $314,500 "have been agreed upon and will be paid." This form stated that these payments had been or would be made *366 "per court orders as available." The form further stated that: No part of these commissions or fees has been claimed as an income tax deduction. If the amount is reduced, or if an election is made to claim any part of these expenses as an income tax deduction, the Internal Revenue Service will be notified, and any resulting tax will be paid. The recipients of these commissions and fees will report them for income tax purposes in the year received. In his notice of deficiency the respondent limited petitioner's deduction for executors' fees to $139,990.55, in the absence of any provision for extraordinary fees by the probate court. The computation, under the provisions of Section 150.020, Nevada Revised Statutes, was as follows: Value of estate per court-appointed appraisers and the inventory and appraisement filed April 8, 1968 $6,993,527.70 Allowable fees: 6% of value from $0.00 to $1,000.00
60.00
4% of value from $1,000.00 to $5,000.00
160.00
2% of value in excess of $5,000.00
$139,770.55
$139,990.55
Petitioner has not provided us with any of the probate court's orders regarding extraordinary fees, although the parties agreed to leave the record *367 open for an additional sixty days for that express purpose. Thus, we do not know whether such fees have actually been paid or allowed by the probate court. We have previously held that "[executor's] commissions may be deducted for estate tax purposes before they have been paid or allowed by the Court having jurisdiction of the estate where they are based on a reasonable estimate of the fees allowable under the State laws." [5]
In the absence of such proof, we will not allow petitioner to deduct fees which exceed those set by Nevada law. However, we will permit petitioner's counsel to provide this proof in the Rule 155 computation, since the Nevada statute allows the probate court to make a reasonable allowance for services in regard to real property when such is just and reasonable. Any delay by petitioner's counsel could be costly here. [6]
*368 The estate has also claimed attorney's fees and related expenses, under Section 20.2053-3(c)(2), Estate Tax Regs., in an amount not yet established, which will be incurred in contesting the determined deficiency. These expenses will also be allowed to the extent allowed by the probate court upon our examination of its order in the Rule 155 computation. To reflect the concessions of the parties and the conclusions reached herein, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise noted.↩
2. See Overcash v. United States,↩ 74-2 U.S.T.C. Par. 13021 (E.D. Va., 1974) where the Court said: "It is clear that a determination of fair market value, being a question of fact, will depend upon the unique circumstances in each case and no definitive formula can be devised that will be applicable to the multitude of valuation issues raised in estate tax cases. Thus, the Court may exercise its judgment in the light of its own knowledge and give to expert testimony only its merited weight."
3. The stated value was $4,640,573.30, but parcels valued at $250,000 were inadvertently omitted from the summation.↩
4. See Estate of John C. Mitchell,T.C. Memo. 1968-297↩.
5. Estate of Sol Schildkraut,T.C. Memo. 1965-239, aff'd without discussion of this point, 368 F. 2d 40↩ (C.A. 2, 1966).
6. Petitioner has not argued that it should be allowed to deduct the fees on the basis of the declaration; hence we do not reach that question here.↩