# United States Tax Court

T.C. Memo. 2024-72

CORNING PLACE OHIO, LLC, CORNING PLACE OHIO
INVESTMENT, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 12428-20.                                   Filed July 17, 2024.

————————

*Sam A. Camardo*, *Michelle M. Hervey*, *Guenther K. Fanter*, and *Lucas L. Witters*, for petitioner.

*David N. Stock*, *Christina L. Cook*, *Joseph E. Nagy*, *Megan E. Heinz*, *Anita A. Gill*, *Mark J. Miller*, and *William M. Rowe*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 2

FINDINGS OF FACT ........................................................................ 3

I.   The Garfield Building ...................................................... 4

II.  The Rehabilitation Plan ................................................. 4

III. The Conservation Easement Scheme ............................. 8

IV.  The Investors ................................................................... 10

V.   The Easement .................................................................. 10

VI.  "Lost Development Rights" ............................................. 11

VII. Mr. Clark's Valuation Methodology .............................. 14

**Served 07/17/24**

2

**[*2]**
VIII.    Tax Return and Examination ............................................... 17

IX.  Trial ...................................................................................... 19

    A.    Petitioner's Expert ..................................................... 19

    B.    Respondent's Expert ................................................... 21

OPINION ..................................................................................... 22

I.   Burden of Proof ..................................................................... 22

II.  Charitable Contribution Deduction ...................................... 22

III. Valuation ............................................................................... 27

    A.    Valuation Principles ................................................... 27

    B.    "Before" Value of the Garfield Building ................................. 28

        1.    Actual Transaction Involving the Subject Property ....... 28

        2.    Other Valuation Methods ............................................ 30

            a.    Cost-Based Approach .............................................. 31

            b.    Market Approach ..................................................... 31

            c.    Income Approach ..................................................... 36

    C.    "After" Value of the Garfield Building ................................. 42

    D.    Valuation of the Easement ................................................... 43

IV.  Real Estate Loss ................................................................... 44

V.   Penalties ............................................................................... 45

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  This case presents what might be called the urban version of the conservation easement tidal wave that has deluged this Court.  A partnership acquired a historic office building in downtown Cleveland, Ohio, and proceeded to renovate it into luxury

[*3] apartments. The renovation was undertaken pursuant to a "rehabilitation plan" approved by the National Park Service (NPS) and the State of Ohio, both of which awarded historic preservation tax credits. The partnership used the tax credits to finance the renovation.

Gilding the lily, the partnership then granted a conservation easement over the very same property, claiming a $22.6 million charitable contribution deduction on the theory that it had relinquished valuable development rights. The "lost development rights" allegedly consisted of the notional opportunity to add a 34-story vertical addition on top of the historic building. Apart from being structurally implausible and economically unsound, adding 34 floors of steel and concrete atop the building would have required the partnership to forfeit the Federal and Ohio tax credits upon which it relied to finance the renovation. As a condition of receiving those credits, it had pledged that the rehabilitation plan would entail no rooftop improvements "visible from the street." Needless to say, a 34-story addition on top of the building would have been visible from the street. Finding that the 34-story tower was a chimerical concept ginned up solely to support a wildly inflated appraisal, we will sustain the Commissioner's disallowance of the charitable contribution deduction and his imposition of a 40% penalty under section 6662(h)[1] for a "gross valuation misstatement."

## FINDINGS OF FACT

The following facts are derived from the parties' pleadings, five Stipulations of Facts with attached Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. Corning Place Ohio, LLC (Corning Place), is an Ohio limited liability company (LLC) classified as a TEFRA partnership at all relevant times.[2] Petitioner Corning Place Ohio Investment, LLC (CP Investment or petitioner), is its tax matters partner. Both entities had their principal place of business in Ohio when the Petition was timely filed.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round most amounts to the nearest dollar.

[2] Before its repeal, TEFRA (Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71) governed the tax treatment and audit procedures for many partnerships, including Corning Place.

[*4] I.     *The Garfield Building*

The easement at issue is a historic preservation easement associated with the Garfield Building, an 11-story building at the corner of Euclid Avenue and E. Sixth Street in Cleveland, Ohio, to which we will sometimes refer as the "Building."  The Building was constructed in 1893 for Harry A. and James R. Garfield, sons of President James A. Garfield, and built on land owned by John D. Rockefeller.  Built in the Renaissance Revival style, the Garfield Building was designed by Henry Ives Cobb, a noted Chicago architect.  It exemplifies an architectural trend of the late 19th and early 20th centuries, when architects worked to adapt traditional styles to large-scale commercial buildings then being erected in major American cities.

The Garfield Building is considered the first steel-frame "skyscraper" east of Cleveland's Public Square, making it an early local example of a significant technological shift in building construction.  It has been listed on the National Register of Historic Places since 2002.  The Secretary of the Interior has denominated the Garfield Building a "certified historic structure" that contributes to the integrity of the Euclid Avenue Historic District.

In 2008 Westcore East Sixth Street, LLC (Westcore), acquired the Garfield Building and eight associated parcels for $8 million. Westcore leased the Garfield Building to a bank, which did business next door in the National City Bank Building (National Bank Building). The National Bank Building includes a grand central lobby space with three-story Corinthian columns and an elaborate coffered ceiling.  That space is adjacent to the Garfield Building along its north-south wall. Sometime before 2014, the bank moved to a new location, leaving both buildings vacant.

II.     *The Rehabilitation Plan*

Frank Sinito is the founder and chief executive officer of the Millenia Cos. (Millenia), a group of entities that develop, rehabilitate, own, and manage residential and commercial real estate in Cleveland and other U.S. metropolitan areas.  In 2014 Mr. Sinito identified the Garfield Building, then a vacant commercial shell, as a good candidate for rehabilitation into high-quality residential apartments.  He and his team accordingly entered into negotiations with Westcore to purchase the Garfield Building and the eight associated parcels, which included ownership of some space within the adjacent National Bank Building.  Mr.

[*5] Sinito's plan was to (1) rehabilitate the Garfield Building into up-scale apartments; (2) rehabilitate the central space of the National Bank Building into a high-end restaurant, to be called the Marble Room; and (3) secure Ohio and Federal historic preservation tax credits to help finance this redevelopment.

In March 2014, before buying an interest in the Building, Mr. Sinito engaged RSM US, LLP (RSM), to help prepare applications for the tax credits. Ron DeGrandis, a lawyer and accountant at RSM, played the principal role in that effort. Mr. DeGrandis specialized in historic preservation tax credits and conservation easements.

On March 28, 2014, Westcore, which then owned the Garfield Building, submitted to the State of Ohio an application package seeking $5 million of Ohio historic preservation tax credits. This application package included a proposed "rehabilitation plan" for the Building. Westcore concurrently submitted the same rehabilitation plan to the NPS as part of its request for $4,171,600 of Federal historic preservation tax credits.

The rehabilitation plan explained in detail how the Garfield Building would be renovated in a manner that maximized protection of its remaining historically important features, both exterior and interior. The rehabilitation plan indicated that certain improvements would be made to the roof of the Building, including the addition of a penthouse unit. But it confirmed that "all new rooftop construction will be invisible from the ground." Specifically, the NPS application stated:

> None of the proposed rooftop construction—including new penthouse structures, deck railings, or skylights—will be visible at ground level from any location within the Euclid Avenue Historic District . . . . It will therefore have no visual impact on the [B]uilding or the historic district, fully preserving [the Building's] historic exterior appearance, character, and setting.

On June 24, 2014, Ohio approved the rehabilitation plan for the Garfield Building, confirming Westcore's entitlement to "a maximum tax credit" of $5 million. It advised that, within 90 days after completing the renovation, the applicant had to verify that "the project has been completed in accordance with the application . . . and request that an Ohio Historic Preservation Tax Credit Certificate be issued."

**[\*6]**   On July 28, 2014, the NPS likewise approved the rehabilitation plan and certified the Garfield Building as a "certified historic structure" entitled to historic preservation tax credits.  In approving the application, the NPS noted that questions had been raised about the proposed rooftop addition.  But it indicated that these concerns had been assuaged: "As per a site visit and statements from the owner and project contact the new addition will be not be visible from street level within the Euclid Avenue Historic District."

As Ohio's letter indicated, the historic preservation tax credits were not awarded upon approval of the rehabilitation plan.  Rather, the developer had to faithfully implement the rehabilitation of the Building, consistently with the plan, in order for the credits to become available.  Once the credits were awarded, the developer was prohibited from making any change to the protected areas for five years.[3]

On November 4, 2014, Corning Place and CP Investment were incorporated as the vehicles for implementing rehabilitation of the Garfield Building.  Several weeks later, Corning Place sought a loan from Huntington National Bank (Huntington Bank) to help finance its acquisition of the Building.  In connection with that request, Huntington Bank commissioned an appraisal from Colliers International Valuation & Advisory Services (Colliers).

Colliers determined that the fair market value (FMV) of the Garfield Building in its current "as is" condition—a vacant 11-story commercial shell—was $6 million.  It concluded that the property's highest and best use (HBU) would be "conversion to multi-family residential development"—specifically, 120+ apartment units on the ten floors above the ground level.  It estimated that the Building's value, upon completion of the NPS-approved rehabilitation plan, would be $23.3 million.  In making these determinations, Colliers made the extraordinary assumption that "[t]he property's conversion to multi-family units [will] proceed according to schedule, based on the information provided by the developer.  Should this not be the case, the values determined in this report could be altered."

---

[3] The rehabilitation of the Garfield Building was completed in December 2017. In April 2018 the NPS certified that "the completed rehabilitation meets the Secretary of the Interior's Standards for Rehabilitation and is consistent with the historic character of the property."  The NPS noted that a late change to the rehabilitation plan was the "removal of the penthouse and upper floor additions," thus eliminating any risk that rooftop improvements would be visible from the street.

[*7]   On January 23, 2015, Corning Place purchased the Garfield Building and the eight associated parcels from Westcore. The purchase price was $6 million, the value at which Colliers had appraised the Building two months previously. Westcore was wholly unrelated to Corning Place, Mr. Sinito, and Millenia. Petitioner's real estate expert, Randall Dawson, acknowledged that this sale was "at market" and was "arm's length and reasonable." Corning Place thus acquired, for $6 million, a fee simple interest that included all rights to develop the Garfield Building, including rights in the air space above the Building that theoretically could have been exploited by expanding it vertically.

Corning Place commenced renovation of the Garfield Building, consistently with the NPS-approved plan, beginning in October 2015. Tom Mignogna, a Millenia employee, was the project manager for the rehabilitation project. The record includes an email from Mr. Mignogna dated May 23, 2017, confirming that "[d]emolition/[c]onstruction commenced in October 2015." Mr. Mignogna stated that the Garfield Building "was well under renovation [and] conversion to apartments as of 5/25/16." The Building was entirely covered with scaffolding on that date.

In April 2016 Mr. Sinito amended the application for the Federal and Ohio tax credits, requesting that Corning Place be substituted for Westcore as the "new owner/applicant." He confirmed that Corning Place intended "to proceed with the project as approved by the NPS in July 2014" and that there were "currently no changes to the proposed scope of work." The NPS approved the amendment on May 6, 2016, thereby assigning to Corning Place Westcore's rights to the tax credits associated with rehabilitation of the Garfield Building.

Around this time Corning Place was in negotiations with Bank of America (BOA) to sell its rights to the credits. Mr. Mignogna emailed Mr. DeGrandis on April 8, 2016, indicating that the plan was to "close with BOA in early May." At trial Mr. Mignogna testified that the closing to which he referred in that email was the "closing on [the] historic tax credits." He explained that Millenia intended "to use [the] equity generated from [the sale of] the tax credits for the [rehabilitation] project." Corning Place realized proceeds of roughly $6.6 million from selling to BOA its rights to the historic preservation tax credits. These proceeds

[*8] were a critical component of the financing Corning Place needed to rehabilitate the Garfield Building into apartments.[4]

III.   *The Conservation Easement Scheme*

While negotiations with Westcore were underway, Messrs. Sinito and DeGrandis developed a plan to secure, not only historic preservation tax credits, but also a charitable contribution tax deduction for granting a conservation easement over the Garfield Building. Mr. DeGrandis recommended Claud Clark III as an appraiser to assist with that effort. Mr. DeGrandis thereafter functioned as a middleman, relaying information and data between Mr. Sinito, his staff at Millenia, and Mr. Clark.

Mr. Clark was well known for performing "lost development rights" appraisals. This type of appraisal uses a discounted cashflow (DCF) methodology to calculate the supposed development potential of real estate, often with an assumed HBU as a residential subdivision. By placing an easement on the property, the developer assertedly becomes entitled to a charitable contribution deduction equal to the property's alleged "before" value—hypothetically built out into a multimillion-dollar subdivision—minus the value of the property (often de minimis) after being encumbered by the easement.

In September 2014—four months before Corning Place purchased the Garfield Building—Mr. Sinito engaged Mr. Clark to perform an appraisal of this kind. Mr. Clark accepted this engagement by letter dated September 12, 2014, stating that his fee for the appraisal would be $40,000. Mr. Clark promised to use his "best efforts" to deliver to Mr. Sinito, "within 21 days of receiving the necessary information from the project architect and contractor," his preliminary assessment of the charitable contribution deduction that could be claimed for placing a conservation easement on the Garfield Building. Mr. Sinito signed the engagement letter on September 19, 2014.

In preparing his preliminary assessment Mr. Clark performed his usual residential subdivision analysis, but he hypothesized a development that was vertical rather than horizontal. He worked from a sketch

---

[4] Although Corning Place held entitlements to $9.17 million in Ohio and Federal tax credits, the proceeds realized from the sale of the credits to BOA were roughly 72% of that sum. This discount presumably reflected the risk that the credits might not ultimately be awarded (if the rehabilitation plan was not appropriately completed) and the time value of money (the credits would not become available until the rehabilitation was completed and certified as acceptable).

[*9] prepared by Sandvick Architects (Sandvick). Petitioner did not introduce a copy of that sketch into evidence. But the sketch evidently envisioned a 34-story apartment tower directly atop the Garfield Building, using the Building's entire footprint as its base.

Sandvick derived considerable income from drafting plans for such castles in the air. Julie Dornback, the point person at Sandvick for these projects, testified that she had worked on plans for about 90 conservation easements, of which an estimated 60 were for multistory vertical additions atop existing buildings. She admitted that none of these vertical-expansion plans had ever been implemented by a developer.

On March 3, 2015, Mr. Clark delivered his preliminary "lost development rights" appraisal for the Garfield Building. This was a "restricted appraisal" intended only for Mr. Sinito's use. Mr. Clark warned:

> We are not working from plans of the apartment building. We have been told that the plans are being redrawn. The costs associated with the model were taken from earlier student housing plans and condominium plans. They are most likely not applicable to the revised concept. We are making assumptions that may later be found to be inaccurate. We expect the final valuation to differ from the preliminary value furnished herein.

Mr. Clark's preliminary appraisal consisted mainly of boilerplate text, evidently cut and pasted from prior appraisals. He concluded that the HBU of the Garfield Building was conversion to residential use. He stated that "[t]here have been no sales or transfers of the property in the last three years." That statement was false: Corning Place had purchased the Garfield Building two months previously for $6 million in an arm's-length transaction.

Mr. Clark's analysis (if it can be called that) appeared on a one-page spreadsheet. It assumed a 34-story vertical addition consisting of 415 apartments with an average monthly rent of $2,216. He calculated that figure assuming that an average apartment would occupy 1,108 square feet and would rent for $2 per square foot. Using a DCF analysis, he calculated the net present value of future rents as $124,564,340, and he estimated construction costs and interest totaling $102,436,295. Subtracting the latter from the former, he computed "the value of lost development" as $22,128,045.

[*10] IV.     *The Investors*

CP Investment originally owned 31.5% of Corning Place.  As of May 18, 2016, all of the other investors had surrendered their membership interests in Corning Place, leaving CP Investment owning 100% of it.  Corning Place thus became a "disregarded entity," with CP Investment as its single member.[5]

As of May 18, 2016, Corning Place Manager (managed by Mr. Sinito) owned 48.63% of CP Investment.  The balance of CP Investment was owned by four outside investors: two trusts for the Murfey family (owning 34.37%), a trust for Umberto Fedeli (owning 15%), and a trust for Annette Weber (owning 2%).

The outside investors were trusts and individuals who appear to have invested with Mr. Sinito previously.  Technically speaking, there was no "syndication" because there was no formal offering of securities to investors.  However, the transaction does resemble a syndicated conservation easement transaction in that 100% of the charitable contribution deductions were intended to flow up from Corning Place through CP Investment to the ultimate investors.  A communication from the representative of one investor indicated that he was expecting a $6 million charitable contribution deduction in exchange for a $2 million investment.

V.     *The Easement*

On May 25, 2016, Corning Place, as grantor, executed and recorded a deed of easement (Deed) in favor of Historic Gateway Neighborhood Corp. (Gateway), a qualified organization within the meaning of section 170(h).  The easement covered the entire facade of the Garfield Building, including "the front, sides and rear exterior walls, height, roof lines, color, building materials, and windows."  The parties stated their intention that "the Façade will be retained and maintained forever in its rehabilitated condition and state exclusively for conservation and preservation purposes."

The Deed recited that "the right to develop the air space above the Building . . . is an important and valuable part of Grantor's rights in

_____

[5] Under Federal tax law, a single-member LLC that does not make an election is disregarded, i.e., is treated as a "tax nothing."  The single member is then treated as personally engaging in all transactions engaged in by the LLC.  *See* Treas. Reg. § 301.7701-3(b)(1)(ii).

[*11] the Building." But because "constructing any addition onto the Building or developing the air rights directly above the Building would materially and adversely affect the Façade," Corning Place relinquished those rights and Gateway "accept[ed] relinquishment of [such] Development Rights in gross in perpetuity." However, Corning Place "expressly retain[ed] the right to rehabilitate" the Building and "agree[d] to rehabilitate the Building pursuant to the Rehabilitation Plan" as approved by the NPS. Corning Place confirmed that the renovation "shall be in accordance with the Secretary of the Interior's Standards" for rehabilitating historic buildings.

Attached as Exhibit B to the Deed was a baseline documentation report dated May 16, 2016, prepared by Peter Ketter, the director of historic preservation for Sandvick. Mr. Ketter recited that "[t]he building is currently undergoing a major renovation for conversion to residential use above the first floor, which will remain as retail space." He stated that "[r]emaining historic features and finishes are being preserved" but that "substantial modifications of the interior plan and finishes are being made to accommodate the new use." An attached sketch of the Garfield Building stated that "vertical additions [were] prohibited." Mr. Ketter confirmed that Sandvick was "responsible for the design" of the rehabilitation project.

On July 7, 2016, Corning Place Master Tenant (Tenant), managed by Mr. Sinito, acquired a 10% interest in Corning Place. This reduced CP Investment's ownership to 90%. Corning Place at that point ceased being a "disregarded entity."

VI.     *"Lost Development Rights"*

To value the conservation easement for charitable contribution purposes, Mr. Sinito engaged Mr. Clark to perform a lengthier appraisal of the "lost development rights." Mr. Clark based this appraisal on a more detailed set of drawings developed by Sandvick, specifying that the 34-story, 415-unit apartment tower would add 536,580 square feet to the Garfield Building. At this point Sandvick was wearing two hats. It was the actual architect and project manager for the NPS-approved rehabilitation, which was well underway in mid-2016. But it was also preparing elaborate drawings for an imaginary 34-story vertical addition, which everyone knew would never be built.

Sandvick's agreement with Mr. Sinito stated that it would receive a fee of $800,000 for developing a "feasibility analysis" for use in

[*12] calculating the "Lost Development Potential." That fee was to be paid in full within "thirty (30) days of completion of the Historic Conservation Easement Appraisal." Sandvick advised that, "if [Corning Place] were to proceed with the potential development provided by the feasibility analysis, Sandvick . . . would not be willing to assist [Corning Place] with those efforts because said development would be *negative* to the historic character of the building."

Sandvick's revised plans were dated November 8, 2016. To provide structural support for the 34-story tower, the plans envisioned (among other invasive changes) the insertion of 40+ vertical steel support pillars into the fabric of the Garfield Building, to be spaced evenly across its entire footprint. An additional six vertical support braces were proposed to be inserted inside what is now the upscale Marble Room restaurant in the adjacent National Bank Building. Adding these braces would require excavating more than 130 feet below grade, working around existing support pillars, and adding colossal cement pads going down to the bedrock. The contractor would have to create 40+ holes on each floor of the Garfield Building and drop the support braces through the holes on each of the 11 floors to the cement pads in the subbasement.

To support the feasibility of this vertical expansion scheme, Sandvick secured a structural engineering report from Hach Engineering (Hach) and a geotechnical report from the David V. Lewin Corp. (Lewin). The latter was charged with testing the soil underneath the Garfield Building to ascertain whether it could support the weight of the proposed 34-story tower. Together with Sandvick, Hach and Lewin were part of a cottage industry in Cleveland that specialized in supplying data for "lost development rights" appraisals of historic buildings. As of the date of trial, Hach and Lewin had worked with Sandvick on 50–60 "vertical expansion" projects, all of which were connected to conservation easements, and none of which was ever built.

Hach's report was dated November 4, 2016. The cover letter, referring to the 34-story addition, said: "Such a scheme is felt by the writer to be structurally feasible." Lewin's report, dated October 24, 2016, acknowledged that Lewin had not actually tested the soil underneath the Garfield Building. Rather, it said that borehole samples taken from "previous investigations near the site" suggested that a 34-story tower could be supported.

**[\*13]** Like Sandvick's revised plans, the Lewin and Hach reports were drafted after Corning Place had granted the easement over the Garfield Building. The easement deed prohibited vertical additions, so all participants knew the 34-story addition could not possibly be built. Because the three firms were addressing a purely theoretical proposition, they had no risk of liability if their opinions were poorly researched or ill founded. Petitioner called neither Hach nor Lewin to testify at trial. No witness at trial provided testimony to support the structural feasibility or physical possibility of adding a 34-story apartment tower on top of the Garfield Building.

Structural feasibility aside, the Court finds as a fact that Corning Place, Mr. Sinito, and Millenia never entertained the slightest expectation of actually implementing a 34-story vertical addition on top of the Garfield Building. Several facts point inescapably to that conclusion:

- From the outset, all references to the 34-story addition speak of "*lost* development rights." This is a very odd way to refer to a development plan that one is seriously considering undertaking. There is no evidence that Mr. Sinito or Corning Place ever sought financing for the 34-story addition or investigated whether the City of Cleveland would approve it. It was nothing but a castle in the air ginned up to support a bogus valuation for a conservation easement. The development plan that Mr. Sinito intended to implement—and did implement—was the rehabilitation of the original 11-story building into residential apartments.

- The 11-story rehabilitation plan was submitted to (and approved by) the NPS and Ohio as the basis for securing historic preservation tax credits. Corning Place could not possibly have implemented a 34-story vertical addition consistently with the terms of that rehabilitation plan, which prohibited any structures on the roof of the Garfield Building that could be visible from the street. Faithful implementation of the NPS-approved rehabilitation plan was essential to securing the historic preservation tax credits, and the proceeds from those credits (which were sold to BOA) were essential to Mr. Sinito's financing for the renovation. There was no possibility that Mr. Sinito would have given up the historic preservation credits in order to pursue a fanciful (and wildly expensive) 34-story vertical addition instead.

- Sandvick's plans for the 34-story tower envisioned inserting 40+ vertical support pillars throughout the fabric of the Garfield

**[\*14]** Building. This mode of providing support for the tower would have been highly invasive of the 11 lower floors, destroying any interior rehabilitation that then existed. That being so, it is inconceivable that Corning Place would have commenced the interior rehabilitation of the Garfield Building in October 2015 if it was really considering adding a 34-story tower on top of the Building.[6]

VII.  *Mr. Clark's Valuation Methodology*

Two critical inputs to Mr. Clark's DCF analysis were the estimated construction costs for erecting a 34-story apartment tower and the prices at which the 415 putative new apartments would rent. For both inputs Mr. Clark solicited information from Millenia.

In his March 2015 "preliminary assessment," Mr. Clark estimated that the hypothesized apartments would rent at $2 per square foot. He did not testify at trial, and it is unclear where he got this number. In an email dated June 24, 2015, he reminded Mr. Mignogna "that the value is predicated upon representations by you and Ron [DeGrandis] that $2 is supportable." He asked to be furnished "all information that supports that $2." In another email Mr. Clark suggested that rents charged at "The 9"—the most glamorous apartment complex in Cleveland at the time—might help get to the desired rent number. He asked Mr. DeGrandis: "Do you think you can call your guy at the nines [sic] and get his roll or a summary of his rents by unit type[?]"

Another critical input to Mr. Clark's DCF analysis was the estimated construction cost for the 34-story tower. Mike Kucera, a Millenia employee, originally estimated construction costs of $219 per square foot, a figure he believed "was realistic." Using Mr. Clark's assumption of a 536,580-square-foot addition, Mr. Kucera's figure would have yielded estimated construction costs of about $117.5 million. That would have reduced the value of the "lost development rights" to about

---

[6] Petitioner asserts that renovation of the Garfield Building did not begin until after the easement was granted on May 25, 2016. There is no credible factual support for that assertion. Mr. Mignogna, a Millenia employee, confirmed in an email to Mr. Clark that "[d]emolition/[c]onstruction commenced in October 2015" and that the Garfield Building "was well under renovation [and] conversion to apartments" as of May 2016. As the project manager for the rehabilitation project, Mr. Mignogna was positioned to know when construction started. The Building was entirely covered with scaffolding in May 2016, and Sandvick's baseline documentation report, dated May 16, 2016, stated that "the building is currently undergoing a major renovation for conversion to residential use."

[*15] $7 million, assuming Mr. Clark had correctly calculated $124.5 million as the net present value of future rents. That $7 million figure was unacceptable to Mr. Sinito and his investors.

As of June 22, 2015, Mr. Kucera understood that "currently we are at $172/SF" for construction costs, which he thought was "on the lower (lowest) edge of being able to justify in terms of cost to construct." That day, he emailed Mr. Mignogna and attached a schedule from American Preservation Builders (APB) that showed "comparable current high-rise construction costs." When Mr. Mignogna asked Mr. DeGrandis about this, the latter said that he would "talk to Claud [Clark] and get back to you." Mr. Mignogna subsequently emailed Mr. DeGrandis, saying: "[I]f APB's number is still too high, let us know what number the contractor needs to be at in order for the easement [value] to reach $20M."

This evidence shows that Millenia and Mr. DeGrandis were working together to supply Mr. Clark with whatever he needed to generate at least a $20 million valuation for the easement. That was apparently because this was the estimate of value Mr. Sinito had previously given his investors. In a February 22, 2016, email Mr. DeGrandis stated that Corning Place "will be using [Mr. Clark's] original assessment [i.e., a $22,128,045 easement value] to gauge the investor contribution." According to Mr. DeGrandis, this would create a problem if Mr. Clark's "preliminary assessment is way off in relation to his actual appraisal." Mr. Mignogna testified at trial that Mr. DeGrandis told him that "the easement needed to reach $20 million."

Mr. Clark ultimately used an estimate of construction costs furnished, not by Mr. Kucera, but by JERA Contractors, Inc. (JERA). JERA was another participant in the Cleveland cottage industry that helped generate appraisals for hypothetical vertical expansions of existing buildings. Sandvick regularly used JERA to estimate construction costs for these fanciful projects, and it recommended JERA to Mr. Sinito. JERA's fee for making this estimate, as shown by its invoices to Mr. Sinito, was $7,500.

The construction costs furnished by JERA on April 7, 2017—consisting of a one-page schedule lacking any supporting explanation—total $102,867,921. This figure differs by less than 0.43% from the $102,436,295 figure Mr. Clark had used in making his preliminary estimate in May 2015, using cost numbers he had derived from "earlier student housing and condominium plans." Mr. Clark had warned that

[*16] those cost numbers were "most likely not applicable" to the proposed 34-story apartment tower.

The cost schedule furnished by JERA omitted several important costs, including financing, architectural fees, contingency, and other "soft costs."[7] Petitioner called no representative from JERA as a witness at trial to explain how the costs shown on its one-page schedule were calculated. Petitioner adduced no testimony or other evidence at trial to establish that the expenses shown on JERA's one-page schedule accurately captured the costs of constructing the 34-story tower depicted in Sandvick's plans.

Mr. DeGrandis reviewed the penultimate draft of Mr. Clark's appraisal, which showed a value of roughly $20 million for the easement. That number, which was $2 million less than Mr. Clark's preliminary assessment, left Mr. DeGrandis dissatisfied. In a September 13, 2017, email to Mr. Mignogna, Mr. DeGrandis supplied a link to Mr. Clark's final appraisal and boasted, "I got it up to $22.6M." Mr. DeGrandis testified that he did this by convincing Mr. Clark to change his capitalization rate (or other input to the DCF). The fact that Mr. Clark would cavalierly increase his valuation by 11% at the last minute raises a serious question about his independence.

Mr. Clark's final appraisal was dated August 5, 2017. He rejected the sales comparison approach as a methodology for determining the "before" value of the Garfield Building. His rationale for rejecting this approach was as follows:

> The Garfield Building before the easement is an apartment building with 547 units and totals 680,589 square feet. I did not find any sales of mid- to high-rise residential apartment buildings with over 200 units in downtown Cleveland in the past 48 months. Therefore, because of the lack of data, [the sales comparison] approach is not applicable.

Instead, Mr. Clark relied on the income capitalization approach. He opined that "development of the site as a residential property, specifically as residential *condominiums* with supporting amenities and retail space, would be the highest and best use." Specifically, he assumed

---

[7] "Soft costs" can significantly increase the total cost associated with rehabilitation of a historic building. For example, the NPS-approved rehabilitation plan for the 11-story Garfield Building budgeted $3.7 million for soft costs, including architectural fees, legal fees, insurance, real estate taxes, and 20 other line items.

[*17] a 34-story addition with "560,291 +/− square feet of condo space." He then switched gears and assumed that the tower would add 424 additional *apartments*, consisting of 471,631 square feet, that would rent for $2.06 per square foot.

Using his DCF method, Mr. Clark calculated that the "before" value of the Garfield Building, as a 45-story tower with "547 market rate apartments," would be $47,489,000. He determined that the "after" value, as an 11-story building with 123 apartments renovated according to the NPS-approved rehabilitation plan, was $24,888,000. Subtracting the latter figure from the former, he opined that the FMV of the "lost development rights" (and hence the easement) was $22,601,000.

Mr. Clark's final appraisal of the easement was $472,955 higher than the $22,128,045 preliminary estimate he made in May 2015. And the difference between the two values was only about 2%. That was so even though Mr. Clark had acknowledged in May 2015 that his preliminary estimate was based on questionable data (with construction costs taken from "earlier student housing plans and condominium plans"), that his conclusions were "most likely not applicable to the revised concept," that his "assumptions . . . [might] later be found to be inaccurate," and that he "expect[ed] the final valuation to differ from the preliminary value furnished herein."

VIII. *Tax Return and Examination*

On September 15, 2017, Corning Place filed a return on Form 1065, U.S. Return of Partnership Income, stating that the return was being filed for "the tax year beginning 07-07-2016 [and] ending 12-31-2016." This filing period reflected the fact that, immediately before July 7, 2016, Corning Place was a single-member LLC and thus a "disregarded entity" incapable of filing a return. Corning Place ceased to be a "disregarded entity" on July 7, 2016, when Tenant acquired a 10% interest in it.

On this return, Corning Place reported a charitable contribution deduction of $22,601,000, indicating that 100% of this deduction was allocated to CP Investment. The amount of the claimed deduction corresponded to Mr. Clark's appraised value for the easement. But the easement had been granted—and the charitable contribution had thus been made—on May 25, 2016, six weeks before the first day of the taxable year for which the return was filed. Corning Place also reported a "net

[*18] real estate rental loss" of $665,500, attributable to deductions claimed for "easement expenses."

Corning Place did not enclose with its 2016 return the required $500 filing fee.  *See* § 170(f)(13)(A) ("No deduction shall be allowed with respect to any [facade easement] contribution . . . unless the taxpayer includes with the return . . . a $500 filing fee.").  As required by section 170(f)(11)(D), Corning Place attached to its return a copy of the Clark appraisal, whose table of contents listed "Addenda."  But the Addenda, which included Mr. Clark's resume and qualifications, was missing from the copy of the appraisal included with the return.

On August 13, 2018, the Internal Revenue Service (IRS) informed Corning Place that its 2016 return had been selected for examination. Corning Place was subsequently alerted to two of the errors mentioned above.  On September 17, 2018, it paid the $500 filing fee via PayGov. On March 13, 2019, it supplied the IRS examination team with a complete copy of the Clark appraisal, including the Addenda.

On November 1, 2018, Corning Place submitted another Form 1065 for 2016.  Like its predecessor, this return stated that it was being filed "for tax year beginning 07-07-2016 [and] ending 12-31-2016."  Corning Place attached to this return a receipt from PayGov showing payment of the $500 filing fee.

The tax period for which the two returns referenced above were filed did not include May 25, 2016, the date the charitable contribution was made.  CP Investment was the sole member of Corning Place on that date, and it was thus the proper party to claim that deduction.  The record includes what appears to be CP Investment's file copy of a Form 1065, captioned "second amended return," for its 2016 calendar taxable year.  This document, which bears no signature, states that it was prepared by RSM and is dated July 9, 2020.  This Form 1065 shows the same information as the two Corning Place returns, i.e., a charitable contribution deduction of $22,601,000 and a "net real estate rental loss" of $665,500.

On July 23, 2020, the IRS issued Corning Place a Notice of Final Partnership Administrative Adjustment (FPAA) disallowing the charitable contribution deduction in its entirety.  The FPAA determined that Corning Place had failed to establish that (1) it had made a "contribution or gift" during its 2016 tax year, (2) any gift "satisfied all the requirements of I.R.C. § 170," or (3) "the value of the contributed property . . .

**[\*19]** was greater than $0." The FPAA disallowed the $665,500 deduction for "other expenses" on the ground that Corning Place had not substantiated that those expenses qualified for deduction under section 162. Finally, the FPAA determined a 40% penalty for a "gross valuation misstatement" under section 6662(h) and (in the alternative) a 20% penalty under other provisions of sections 6662 and 6662A.

Petitioner timely petitioned for readjustment of partnership items. On March 9, 2023, the parties submitted a Stipulation of Settled Issues in which they agreed that (1) the Garfield Building is a "certified historic structure," as defined in section 170(h)(4)(C); (2) Corning Place is not liable for the reportable transaction understatement penalty imposed by section 6662A; and (3) the IRS secured timely supervisory approval, within the meaning of section 6751(b), for all other penalties determined in the FPAA.

IX.  *Trial*

A.  *Petitioner's Expert*

Petitioner called as its valuation expert Randall D. Dawson, an executive vice president with CBRE Valuation and Advisory Services. The parties stipulated that Mr. Dawson was an expert in real estate appraisal, and we recognized him as such. Mr. Clark, who prepared the appraisal attached to Corning Place's 2016 return, did not testify at trial.[8]

Before commencing his work, Mr. Dawson was supplied with copies of Mr. Clark's 2015 preliminary assessment and August 2017 final

---

[8] On December 18, 2018, the United States filed a complaint against Mr. Clark and other defendants seeking an order enjoining them from organizing, promoting, or selling abusive syndicated conservation easement transactions. The complaint alleged that Mr. Clark, in preparing appraisals from 2009 onwards, relied on inappropriate assumptions and methodologies to inflate the value of the conservation easements he appraised, resulting in his customers' claiming improper and outsized charitable contribution tax deductions. *See* Complaint at 37, *United States v. EcoVest Cap. Inc.*, No. 1:18-cv-05774 (N.D. Ga. Dec. 18, 2018), ECF No. 1. On March 20, 2023, the United States and Mr. Clark filed a joint motion of entry of final judgment wherein Mr. Clark consented to the entry of an injunction barring him from preparing or assisting in the preparation of any appraisal intended to be a "qualified appraisal" within the meaning of section 170(f)(11)(E). *See* Final Judgment of Permanent Injunction Against Defendant Claud Clark III at 2–3, *EcoVest Cap. Inc.*, No. 1:18-cv-05774 (N.D. Ga. Mar. 20, 2023), ECF No. 419.

[*20] appraisal.[9]  In several respects Mr. Dawson's appraisal seems derivative of Mr. Clark's.  Like Mr. Clark, Mr. Dawson performed a "lost development rights" appraisal, valuing the easement as equal to the profit supposedly forfeited by forgoing construction of a 34-story apartment tower.  Like Mr. Clark, Mr. Dawson relied on Sandvick's plans for the hypothetical build-out of the 34-story tower.  Like Mr. Clark, Mr. Dawson used JERA's one-page estimate of construction costs as a principal input to his DCF calculation.

And like Mr. Clark, Mr. Dawson rejected the sales comparison approach as a methodology for determining the "before" value of the Garfield Building.  Following Mr. Clark, he assumed that the Garfield Building, before the granting of the easement, was the 45-story structure hypothesized in Sandvick's plans.  He thus assumed (as did Mr. Clark) that the universe of comparable transactions would be sales of buildings resembling that hypothetical 45-story structure.  The two-sentence rationale he offered for rejecting the sales comparison approach echoed Mr. Clark's rationale almost verbatim:

> There is a paucity of similar improved sales of mid- to high-rise multifamily apartment complexes with over 250 units in the downtown Cleveland marketplace and on a regional basis within the past 60 months.  As such, the sales comparison approach is not applicable.

Mr. Dawson calculated that the "before" value of the Garfield Building, as a supposed 45-story tower with 547 apartments, would be $43.5 million; that its "after" value, as an 11-story building with 123 apartments renovated according to the NPS-approved rehabilitation plan, would be $21 million; and that the value of the "lost development rights" (and hence of the easement) was $22.5 million.  Perhaps not coincidentally, Mr. Dawson's valuation of the easement differs by only $100,000, or 0.4%, from Mr. Clark's $22.6 million valuation.

Mr. Dawson acknowledged that Corning Place had purchased the Garfield Building for $6 million from Westcore in January 2015.  He acknowledged that this sale was "at market" and was "arm's length and reasonable."  But he accorded no weight to this transaction in determining the "before" value of the Garfield building on May 25, 2016.

---

[9] Mr. Dawson was also provided with copies of (1) Sandvick's November 2016 "lost development study," (2) JERA's construction cost estimate, (3) Hach's structural engineering report, and (4) Lewin's geotechnical report.

21

B.    *Respondent's Expert*

Respondent called as his valuation expert Charles T. Brigden, a managing director of JLL Valuation and Advisory Services.  Mr. Brigden is the coauthor of "Appraising Conservation and Historic Preservation Easements," a textbook published in its second edition by the Appraisal Institute in 2020.  The parties stipulated that Mr. Brigden was an expert in real estate valuation, and we recognized him as such.

Before preparing his appraisal report, Mr. Brigden was informed neither of petitioner's nor of respondent's position as to the value of the easement.  He was not supplied with a copy of the Clark appraisal or other prior appraisals of the Garfield Building.  Unlike Mr. Dawson, Mr. Brigden performed his analysis without the risk of being biased toward the particular result desired by his client.

Mr. Bridgen determined that the HBU of the Garfield Building—a vacant commercial shell on May 25, 2016—was rehabilitation and conversion into 123 residential apartments.  In determining its "before" value, he placed principal weight on the sales comparison approach.  He accordingly searched for sales of comparable commercial buildings in downtown Cleveland with similar development potential.  Starting with a universe of 150+ sales, Mr. Brigden narrowed his focus to five transactions that occurred between December 31, 2013, and January 1, 2015.

Each transaction involved a commercial office building in downtown Cleveland that was acquired by a developer for conversion to residential use.  The buildings ranged in size from 11 to 20 stories and were situated within six blocks of the Garfield Building.  Each building was in a Historic District, and historic preservation tax credits were subsequently awarded for rehabilitation of all five properties into apartment buildings.

The purchase prices of the properties that Mr. Bridgen selected as comparable ranged from $2.7 million to $5.4 million.  After making various adjustments (e.g., for motivation of buyer/seller, conditions of sale, date of sale, building size/configuration, location, market conditions, conditions of improvements, and zoning), Mr. Brigden determined that the value of the Garfield Building in its "as is" condition was $4.83 million as of May 25, 2016.  He noted that Corning Place had purchased the Building for $6 million in January 2015, but he did not include that transaction as a comparable sale.

**[\*22]** To determine the "after" value of the Garfield Building under the sales comparison approach, Mr. Brigden found six recent sales of easement-encumbered commercial buildings in downtown Cleveland. He determined that three sales between September 2014 and September 2015 supplied the most useful data. After making various adjustments, he determined an "after" value of $4.07 million for the Building, generating an easement value of $760,000 under the sales comparison approach. Amalgamating that result with the results he reached using two other valuation methodologies—the cost approach and the income capitalization approach—he settled on a "before" value of $4.8 million, an "after" value of $4 million, and an $800,000 value for the conservation easement.

## OPINION

### I.  *Burden of Proof*

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect [to that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these conditions with respect to any factual issue that has salience in deciding Corning Place's entitlement to the disputed deductions. The burden of proof thus remains on petitioner.

### II.  *Charitable Contribution Deduction*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1). Deductions generally are not allowed for gifts of property consisting of less than the donor's entire interest in that property, but there is an exception for (among other things) a "qualified

**[*23]** conservation contribution." *See* § 170(f)(3)(A), (B)(iii). This exception applies where (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the donation is "exclusively for conservation purposes." § 170(h)(1). Where (as here) a contribution of property is valued in excess of $500,000, the taxpayer must both obtain and attach to its return "a qualified appraisal of such property." § 170(f)(11)(D). Failure to comply with these requirements generally precludes a deduction. *See* § 170(f)(11)(A)(i) (providing that "no deduction shall be allowed" unless specified substantiation requirements are met).

Respondent contends that the charitable contribution deduction at issue should be denied in its entirety on ten distinct and independently sufficient grounds. We agree with respondent's bottom line, but we find it sufficient to address just one of his arguments, namely, his contention that Corning Place did not make any charitable contribution during the 2016 tax year for which its return was filed.[10]

Section 170(a) provides that "[t]here shall be allowed as a deduction any charitable contribution . . . payment of which is made within the taxable year." Where a return is filed for a fractional part of a year, the term "taxable year" means "the period for which such return is made." § 7701(a)(23). A return for a short taxable year is required if a taxpayer is not in existence for the entire taxable year. Treas. Reg. § 1.443-1(a)(2); *see* § 443(a)(2).

---

[10] Respondent also contends that the IRS properly disallowed the charitable contribution deduction in its entirety because (1) Corning Place failed to include with its 2016 return the $500 filing fee mandated by section 170(f)(13)(A); (2) the Deed failed to protect the conservation purpose in perpetuity, as required by section 170(h)(5), because it did not protect the entire exterior of the Garfield Building as it existed on the contribution date; (3) Corning Place failed to comply with the "contemporaneous written acknowledgment" requirement of section 170(f)(8); (4) the Form 8283, Appraisal Summary, submitted by Corning Place failed to include all of the information required by the regulations; (5) Corning Place failed to include with its return photographs of the entire exterior of the Garfield Building, as required by section 170(h)(4)(B)(iii)(II); (6) the baseline documentation submitted by Corning Place did not comply with Treasury Regulation § 1.170A-14(g)(5)(i); (7) the appraisal attached to Corning Place's return, prepared by Mr. Clark, was not a "qualified appraisal" prepared by a "qualified appraiser," as required by section 170(f)(11)(D) and (E)(ii) and the corresponding regulations; (8) the donation of the easement was not made "exclusively for conservation purposes" as required by section 170(h)(1)(C); and (9) Corning Place lacked the donative intent required for a charitable contribution under section 170(a)(1). We find it unnecessary to address these arguments because we sustain the disallowance of the deduction in toto for the reason discussed in the text.

**[\*24]**  Corning Place became a single-member LLC on May 18, 2016, and it remained a single-member LLC until July 7, 2016, when Tenant was added as a 10% member.  Corning Place was not a per se corporation under Treasury Regulation § 301.7701-2(b), and it did not elect to be classified as a corporation under Treasury Regulation § 301.7701-3.  Thus, as petitioner concedes, Corning Place during this period was disregarded as an entity separate from its owner, CP Investment.  As a result, all items of income, gain, loss, deduction, or credit relating to Corning Place between May 18 and July 6, 2016, were directly attributable to and reportable by CP Investment.

Corning Place sprang back to life as a partnership on July 7, 2016, and thereupon became eligible to file a Federal tax return.  Electing the calendar taxable year, it filed a return on Form 1065 for the short year beginning July 7 and ending December 31, 2016.  It was on this return that it claimed a $22.6 million charitable contribution deduction for donating to Gateway a conservation easement over the Garfield Building.

The contribution to Gateway, however, was made on May 25, 2016.  That date preceded July 7, 2016, the first day of Corning Place's taxable year ending December 31, 2016.  Section 170(a) by its terms allows a deduction only for a charitable contribution "payment of which is made within the taxable year."  Because Corning Place did not make payment of the contribution within its taxable year beginning July 7 and ending December 31, 2016, as claimed on its 2016 return, the Commissioner correctly denied that deduction.  *See, e.g.*, *Hagen Advert. Displays, Inc. v. Commissioner*, 407 F.2d 1105, 1110 (6th Cir. 1969) ( "[The] taxpayer, not the Commissioner, must bear the burden of reporting in the proper tax year."), *aff'g* 47 T.C. 139 (1966); *Torres v. Commissioner*, 88 T.C. 702, 737 (1987) (holding that a partnership that came into existence for Federal tax purposes on November 13, 1974, was entitled to depreciation deductions only for its short taxable year commencing on that date (citing §§ 441(b)(3), 443(a)(2)); *Sutow v. Commissioner*, T.C. Memo. 1992-473, 64 T.C.M. (CCH) 537, 542.

Against this conclusion petitioner advances two arguments, neither of which has merit.  First, it alleges that CP Investment in 2020 filed a "second amended return" for 2016 on which it claimed the $22.6 million charitable contribution deduction.  The record includes what appears to be CP Investment's file copy of a Form 1065, captioned "second amended return," for its 2016 calendar taxable year.  This document, which bears no signature, states that it was prepared by RSM on July 9, 2020.  Because the contribution was made during *CP Investment's* 2016

[*25] calendar taxable year, petitioner relies on this document to show that the contribution was made "within the taxable year" as required by section 170(a).

CP Investment, as the sole member of Corning Place on May 25, 2016, was admittedly the correct party to report that contribution. But the IRS has no record of having received a second amended return from CP Investment for 2016. The return petitioner offered into evidence is unsigned. Petitioner supplied no proof of mailing, such as a certified or registered mail receipt, to show that a signed version of the document was in fact mailed. And there is no evidence—such as a "stamped received" notation on the return or on a U.S. Postal Service (USPS) return receipt—showing that the IRS received an amended return for CP Investment. *See Son Gee Wine & Liquors, Inc. v. Commissioner*, T.C. Memo. 2013-62, 105 T.C.M. (CCH) 1407, 1411.

In support of its allegation that a second amended return for CP Investment was filed with the IRS, petitioner submitted a USPS tracking report and attached receipt for $63.30. The tracking report shows that an unidentified item with tracking number ending in 202958 was delivered to the IRS in Ogden, Utah, on September 8, 2020. For several reasons, we find that this document does not satisfy petitioner's burden of proof.

First, we find it surprising that an amended return dated July 9, 2020, involving a matter of some importance, would not have been mailed until September 8, 2020, two months later. Second, there is no evidence that the item delivered on September 8, 2020, was a second amended return for CP Investment. Curiously, the $63.30 receipt indicates that two "wild orchids" with a unit price of $11.00 were also purchased at the time of mailing. Petitioner did not call the person to whom USPS gave this receipt as a witness to testify as to what document was actually mailed. Third, the cover sheet attached to the amended return, prepared by RSM, explains that "this return has been prepared for electronic filing." As a "special instruction" RSM told its client: "Do not mail the paper copy of the return to the IRS." If the return had been electronically filed, RSM or petitioner would have received confirmation of that fact. But petitioner produced no such evidence at trial.

In any event, even if CP Investment did file a second amended return for 2016, that filing would not save the day for petitioner. This case does not concern return items reported by CP Investment for its calendar taxable year ending December 31, 2016. Rather, the case

**[\*26]** concerns return items reported by Corning Place for its short taxable year beginning July 7, 2016, and ending December 31, 2016.

Section 6226(f), captioned "Scope of judicial review," defines the limits of our jurisdiction in a TEFRA proceeding such as this. It provides in relevant part that "[a] court with which a petition is filed . . . shall have jurisdiction to determine all partnership items of the partnership for the partnership taxable year to which the [FPAA] relates." Our jurisdiction is thus limited to determining partnership items of Corning Place for its short taxable year beginning July 7 and ending December 31, 2016—the "partnership taxable year" to which the FPAA at issue relates. We have no jurisdiction to determine any partnership items of CP Investment for its partnership taxable year beginning January 1 and ending December 31, 2016. That is a different taxable year of a different partnership, and it is not the partnership taxable year to which the FPAA that forms the basis of our jurisdiction "relates." *See Rawls Trading, L.P. v. Commissioner*, 138 T.C. 271, 288–89 (2012); *Sente Inv. Club P'ship of Utah v. Commissioner*, 95 T.C. 243, 247–48 (1990).

Assuming arguendo that the analysis set forth above is correct, petitioner contends that "the FPAA is invalid and there is no adjustment because the FPAA does not adjust any partnership items of Corning Place for the taxable year to which the FPAA relates." We disagree. The FPAA issued to Corning Place indisputably adjusts two partnership items that Corning Place claimed for its short taxable year ending December 31, 2016. The FPAA disallows a $22.6 million charitable contribution deduction reported by Corning Place on the ground (among other things) that payment of the contribution was not "made within the taxable year." § 170(a)(1). That partnership-level deduction and its allocation among Corning Place's partners are "partnership items" of Corning Place. *See* § 6231; Treas. Reg. § 301.6231(a)(3)-1(a)(1)(i). And the FPAA disallows a $665,500 loss deduction reported by Corning Place on the ground that the easement-related expenses were not properly deductible under section 162(a). At bottom, petitioner appears to argue that the FPAA is invalid because Millenia and its agents claimed the charitable contribution deduction on the wrong tax return. Far from showing that the FPAA is invalid, this argument shows that the FPAA's denial of the deduction was correct.[11]

_____

[11] Petitioner has been aware, for at least the past four years, that the charitable contribution deduction should have been claimed on the return filed by CP Investment for its 2016 calendar taxable year. The TEFRA provisions supply a remedy for a

**[\*27]** III.   *Valuation*

We have held that Corning Place for its taxable year beginning July 7, 2016, is entitled to a charitable contribution deduction of zero. But the proper valuation of the easement is relevant in determining the penalties to which it may be subject. On its 2016 return Corning Place valued the easement at $22,601,000. That valuation was predicated on the assumption that Corning Place, by granting the easement, had forfeited the opportunity to construct a 34-story apartment tower on top of the Garfield Building. According to Messrs. Clark and Dawson, those "lost development rights" were worth between $22.5 and $22.6 million. We now consider the reasonableness of that valuation.

A.   *Valuation Principles*

The allowable deduction for a charitable contribution of property is generally the FMV of the property on the date it is contributed. Treas. Reg. § 1.170A-1(a), (c)(1). The regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). This definition, a fixture in the Treasury Regulations since 1972, is universally acknowledged by professional appraisers when valuing charitable contributions of property.

Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965). To support their respective positions on the value of the easement, the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts

---

problem of this sort. Section 6227 permits the tax matters partner to file, within a specified period after the filing of a partnership return, "a request for administrative adjustment" of partnership items. *See Samueli v. Commissioner*, 132 T.C. 336, 340–41 (2009); Treas. Reg. § 301.6227(d)-1(a). Such a request is made by filing with the IRS Form 8082, Notice of Inconsistent Treatment or Administrative Adjustment Request (AAR). *See* Treas. Reg. § 301.6227(d)-1(a). If the IRS declines to allow the AAR in full, section 6228 provides procedures for judicial review of the IRS decision. There is no evidence that CP Investment availed itself of this remedial AAR procedure. That being so, petitioner is in no position to complain that disallowance of the deduction on Corning Place's return was unreasonable or unfair.

**[\*28]** considered in reaching their conclusions.  *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment.  *Parker*, 86 T.C. at 561.  We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable.  *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts).  And we may determine FMV from our own examination of the record evidence.  *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

The parties agree that the easement should be valued by calculating the difference between the FMV of the Garfield Building before and after the easement was granted—commonly called the "before and after" method.  In deciding the "before" value, we must take into account not only the actual use of the Garfield Building as of May 25, 2016, but also its HBU.  *See Symington v. Commissioner*, 87 T.C. 892, 896 (1986); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii).

A property's HBU is the most profitable use for which it is adaptable and needed, or likely to be needed in the reasonably near future.  *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington*, 87 T.C. at 897.  If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability."  *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985).  In determining the HBU of property subject to a facade easement, we take into account the manner in which the property would likely have been developed absent the easement.  *Simmons v. Commissioner*, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 216, *aff'd*, 646 F.3d 6 (D.C. Cir. 2011).  We exclude from consideration any proposed uses that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable."  *Olson*, 292 U.S. at 257.

### B.     *"Before" Value of the Garfield Building*

#### 1.     *Actual Transaction Involving the Subject Property*

Before the granting of the easement, the Garfield Building was a vacant 11-story commercial shell.  The best evidence of a property's FMV is the price at which that same property changed hands in an arm's-length transaction reasonably close in time to the valuation date.  *Estate of Newberger v. Commissioner*, T.C. Memo. 2015-246, 110 T.C.M.

**[*29]** (CCH) 615, 616–17 (observing that no evidence is more probative of a donated property's FMV than its direct sale price); *see Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 242–43 (1968), *aff'd per curiam*, 406 F.2d 288 (2d Cir. 1969). The record here includes such evidence, and it is compelling.

In January 2015 Millenia (using Corning Place as the acquisition vehicle) purchased the Garfield Building and the eight associated parcels from Westcore. The Building was then, as it was on the valuation date, a vacant commercial shell. The purchase price was $6 million, the value at which Colliers had appraised the Building two months previously. Millenia and Westcore were sophisticated players in the real estate business with ample knowledge of the Cleveland real estate market. Westcore was wholly unrelated to Corning Place, Mr. Sinito, and Millenia. Mr. Dawson, petitioner's real estate expert, acknowledged that this sale was "at market" and was "arm's length and reasonable."

Petitioner has submitted no expert testimony or other evidence suggesting that real estate conditions in the downtown Cleveland market changed significantly between January 2015, when Millenia purchased the property, and May 2016, when the easement was granted. Although rehabilitation of the Garfield Building commenced in October 2015, petitioner submitted no evidence showing the extent or value of the work that was done (or of any improvements that were made) between October 2015 and May 2016. In short, petitioner has adduced no evidence suggesting that the FMV of the property was meaningfully higher on the valuation date than it was in January 2015. We accordingly find that the best evidence of the FMV of the Garfield Building, before the easement was granted on May 25, 2016, was the $6 million price Millenia had paid to acquire the property 15 months previously.[12]

---

[12] Petitioner errs in relying on the rebuttal expert report of Joseph Marinucci, president of the Downtown Cleveland Association. He offered high-level observations about the Cleveland real estate market, e.g., that "people moving downtown want to live in cool places" that "reflect the past glory of Cleveland." He testified as to a 56% population increase in downtown Cleveland between 2010 and 2016, but he ignored the fact that most of this increase occurred before January 2015, when Millenia acquired the Garfield Building for only $6 million. And while touting the fact that 2,000 apartments were added during this six-year period, he ignored the fact that the putative 45-story complex would add 547 new apartments in one fell swoop. Respondent urges that Mr. Marinucci's testimony should be discounted because he has close connections with (and has advocated for) real estate developers, including Mr. Sinito. Because we found Mr. Marinucci's testimony to have little or no evidentiary weight in

**[\*30]** Petitioner contends that the $6 million acquisition cost reflects only the value of Garfield Building in its "as is" condition, ignoring the value of the rights to develop the air space above the Building. This argument makes no sense, either in legal or in economic terms. By paying $6 million, Millenia acquired a fee simple interest in the Garfield Building. That fee simple interest included all rights to develop the Building in any physically possible, legally permissible manner. Among its many options Millenia had the right (1) to renovate the 11 floors into retail space and upscale apartments, (2) to add a two-story penthouse on the roof (as proposed in the rehabilitation plan initially submitted to the NPS), or (3) to construct a tower adding some number of additional floors. Because Millenia acquired ownership of all these development rights by paying $6 million, its acquisition cost plainly included whatever value inhered in the right to develop the air space above the Garfield Building.

In effect, petitioner is contending that the "air rights" above the Garfield Building were worth $22.6 million. The arm's-length price Millenia paid to acquire the Building shows that this argument has no factual basis. As a knowledgeable real estate investor in the Cleveland market, Westcore was aware that vertical expansion of commercial buildings was a conceivable development option. If Westcore had believed that the air rights above the Garfield Building were worth anything close to $22.6 million, it would not have sold the Building, *including the air rights*, for $6 million.[13]

## 2. *Other Valuation Methods*

In the absence of actual transactions involving the subject property, courts typically consider one or more of three approaches to determine the FMV of real property: (1) the market approach, (2) the income approach, and (3) a cost or asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). We consider these other methods as providing a check on the $6 million "before" value indicated by the price Corning

---

determining the "before" value of the Garfield Building, we need not consider his possible lack of impartiality.

[13] The trial evidence established that "air rights" above existing buildings can have significant value in densely populated areas (like the island of Manhattan) that have few, if any, vacant lots. By contrast, there were dozens of empty lots in downtown Cleveland in May 2016. A developer desirous of constructing a high-rise apartment tower would thus have little incentive to pay millions of dollars extra for air rights.

**[\*31]** Place paid to acquire the Garfield Building and all rights associated with it.

The parties' valuation experts used different approaches to determine the "before" value of the Garfield Building. Respondent's expert, Mr. Brigden, placed principal reliance on the comparable sales approach. In contrast Mr. Dawson relied on the income and cost-based methods, concluding that the comparable sales approach was inapplicable. Determining which method to apply presents a question of law. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013).

### a. *Cost-Based Approach*

The cost approach—often called the replacement-cost method—is based on the principle of substitution. It "derives the value of a property by estimating the reproduction or replacement cost of the improvements, deducting therefrom the estimated depreciation, and then adding the market value of the land." *Talkington v. Commissioner*, T.C. Memo. 1998-412, 76 T.C.M. (CCH) 868, 874. We have often noted that the replacement-cost method is suspect when used to value older historic structures. *See Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 316 (2012) (finding the cost approach unreliable to value a historic preservation easement because "[t]he reproduction cost of an historic building usually bears little relationship to its present economic value" (quoting Richard R. Powell, *Powell on Real Property* § 34A.06, at 34A-54 (Michael A. Wolf ed., 2012)), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part, and remanded*, 755 F.3d 236 (5th Cir. 2014); *Dorsey v. Commissioner*, T.C. Memo. 1990-242, 59 T.C.M. (CCH) 592, 600 (rejecting cost approach in valuing historic preservation easement); *Losch v. Commissioner*, T.C. Memo. 1988-230, 55 T.C.M. (CCH) 909, 915 (same). We thus give no weight to Mr. Dawson's cost analysis in deciding the "before" value of the Garfield Building.

### b. *Market Approach*

The market approach—often called the "comparable sales" or "sales comparison" method—is commonly used to value residential property. It determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions near the valuation date. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for differences between the properties (e.g.,

**[\*32]** building size and location) and the terms of the comparable sales (e.g., proximity to valuation date and conditions of sale). *See Estate of Spruill*, 88 T.C. at 1229 n.24; *Wolfsen Land & Cattle*, 72 T.C. at 19. The solidity of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Wolfsen Land & Cattle*, 72 T.C. at 19–20.

The comparable sales approach is usually the most reliable indicator of value when sufficient information exists about sales of properties similar to the subject property. *See United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979) ("Courts have consistently recognized that, in general, comparable sales constitute the best evidence of market value."); *Whitehouse Hotel*, 139 T.C. at 324–25 (stating that other valuation methodologies are "not favored if comparable-sales data are available"). That is because "the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, 34 T.C.M. (CCH) 117, 119, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)).

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Id.* (quoting *Estate of Rabe*, 34 T.C.M. (CCH) at 119). The same general rule applies where (as here) the subject property is not vacant land, but the empty shell of a commercial building. *See Whitehouse Hotel*, 139 T.C. at 334–35. Although the Garfield Building was not "unimproved" in May 2016, it was vacant and (like vacant land) required a massive capital infusion—several multiples of the $6 million acquisition price—to rehabilitate it into living space. We conclude that Mr. Brigden correctly placed principal reliance on the comparable sales method to determine the "before" value of the Garfield Building.

The first step in employing the comparable sales method is to determine the property's HBU, which points the appraiser to the appropriate universe of comparable transactions. We have defined the HBU of vacant land or an improved property as "[t]he reasonably probable and legal use . . . that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Id.* at 331 (quoting Appraisal Inst., *The Appraisal of Real Estate* 277–78 (13th ed. 2008)).

Mr. Brigden determined that the HBU of the Garfield Building—a vacant 11-story commercial shell in May 2016—was

[*33] rehabilitation and conversion into residential apartments. The actions taken by Millenia and Mr. Sinito show that Mr. Brigden's HBU determination is correct. In March 2014—nine months before Millenia purchased the Garfield Building—Westcore submitted to the State of Ohio and the NPS (with Millenia's assent) a plan to rehabilitate the property into retail space and ten floors of upscale apartments. That proposed use of the Garfield Building was baked into the transaction from the very outset. Mr. Sinito and Millenia were experienced and profit-maximizing real estate developers. The fact that they determined to rehabilitate the property into an 11-story upscale apartment building confirms our view that this was the HBU of the Garfield Building in May 2016.

Consistently with his HBU determination, Mr. Brigden searched for sales of commercial buildings in downtown Cleveland with similar development potential. Starting with a universe of 150+ sales, he narrowed his focus to five transactions that occurred between December 31, 2013, and September 1, 2014. Each transaction involved a commercial office building in downtown Cleveland that was acquired by a developer for conversion to residential use. The buildings ranged in size from 11 to 20 stories and were situated within six blocks of the Garfield Building. Each building was within a Historic District, and historic preservation tax credits were subsequently awarded for rehabilitation of all five properties into apartment buildings.

We find that the five properties Mr. Brigden used in his sales comparison analysis were "comparable" to the Garfield Building. They were commercial buildings of roughly similar size located just a few blocks away. Like the Garfield Building, they were in a Historic District and thus eligible (upon rehabilitation) for the same historic preservation tax credits Millenia sought. Each transaction involved a sale to a developer for the same purpose that Millenia intended to pursue—rehabilitation of the property and conversion to residential use. And each buyer had the same options Millenia had in terms of how that conversion would be accomplished, including the opportunity for vertical expansion that would include additional apartment space.

The purchase prices for the five comparable buildings ranged from $2.7 million to $5.4 million. After making various adjustments (e.g., for building size/configuration, location, market conditions, status of improvements, and conditions of sale), Mr. Brigden determined that the "before" value of the Garfield Building—that is, the value of the

**[\*34]** Building in its "as is" condition before the easement was granted on May 25, 2016—was $4.83 million.

As petitioner notes, some of Mr. Brigden's comparable sales occurred two years or more before the valuation date. But the evidence established that there were relatively few sales of large commercial office buildings, built before 1950, in downtown Cleveland during 2015 and 2016. There were even fewer sales of commercial properties resembling the Garfield Building that were purchased for conversion to apartment use. Mr. Brigden's adjustments reasonably accounted for differences in the timing of the transactions.

Petitioner quibbles with a few granular-level details of Mr. Brigden's comparable sales analysis. But even if we were to accept these critiques, they would not increase Mr. Brigden's valuation to a figure above $6 million, which we have determined to be the best evidence of the "before" value of the Garfield Building on May 25, 2016. Nor has petitioner pointed us to any competing "comparable sales" that would generate a "before" value higher than $6 million.[14]

Instead of proposing comparable sales, both appraisers hired by petitioner took the position that the sales comparison approach "is not applicable" in this case because of a supposed "lack of data." Both assumed that the Garfield Building, before placement of the easement, was the 45-story structure hypothesized in Sandvick's plans. On the basis of that contrary-to-fact assumption, both appraisers surmised that

---

[14] Petitioner argues that Mr. Brigden's HBU determination and selection of comparable sales were improper because he limited his focus to the Garfield Building's "current use." That is not true: Mr. Brigden clearly states that his "before" valuation presumed that the Garfield Building—an existing 11-story commercial shell in the process of renovation and conversion into residential apartments—was to be completed in accordance with the rehabilitation plan submitted to the State of Ohio and the NPS. He accordingly selected as comparables "like kind" commercial shells that were purchased for rehabilitation and conversion into residential apartments. Petitioner also urges that Mr. Brigden's valuation was improper because the IRS did not provide him with copies of Mr. Clark's appraisal and Sandvick's plans, which allegedly prevented Mr. Brigden from evaluating the feasibility of a 34-story vertical addition. But Mr. Brigden independently concluded that *any* expansion on the Garfield Building was improbable. As of the valuation date, the rehabilitation of the Building as an 11-story structure had been thoroughly planned and was well underway. That use was "reasonably foreseeable," and Mr. Brigden appropriately considered these facts in determining the HBU of the property. *See Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987) (noting that subsequent events can be considered in determining a property's HBU if they were reasonably foreseeable on the valuation date); *see also Simmons*, 98 T.C.M. (CCH) at 216.

[*35] the universe of comparable transactions would be sales of buildings resembling the structure envisioned by Sandvick. As Mr. Clark put it: "The Garfield Building before the easement is an apartment building with 547 units and totals 680,589 square feet. I did not find any sales of mid- to high-rise residential apartment buildings with over 200 units in downtown Cleveland in the past 48 months." Mr. Dawson offered essentially the same rationale: "There is a paucity of similar improved sales of mid- to high-rise multifamily apartment complexes with over 250 units in the downtown Cleveland marketplace and on a regional basis within the past 60 months. As such, the sales comparison approach is not applicable."

These rationales make no sense whatsoever. On May 25, 2016, the Garfield Building was not "an apartment building with 547 units and [totaling] 680,589 square feet." It was a vacant 11-story commercial shell with approximately 146,000 square feet of office space, which Millenia was in the process of rehabilitating into a 123-unit apartment building. Because the Garfield Building was an empty commercial shell, it was not comparable—by any stretch of the imagination—to a "mid- to high-rise multifamily apartment complex with over 250 units." What the Garfield Building was comparable to—as Mr. Bridgen correctly determined— were other under-utilized commercial office buildings in downtown Cleveland that held similar potential for redevelopment as residential properties.

Far from encountering a "lack of data," Mr. Brigden found numerous sales of underutilized commercial office buildings in downtown Cleveland, and those transactions supplied a sound basis for a sales comparison approach. To the extent that vertical expansion of these buildings was economically feasible, the developers who purchased these buildings would have factored that opportunity into the purchase prices they were willing to pay. In other words, the market prices paid for these buildings *already reflected* the possibility that they could be expanded upward, just as the $6 million price Millenia paid for the Garfield Building in January 2015 reflected the possibility that it could be expanded upward.

The evidence at trial established that pre-1950 office buildings in downtown Cleveland sold during 2015 and 2016 for an average of about $33 per square foot. For larger commercial properties (between 50,000 and 500,000 square feet), the average sale price was $25.20 per square foot. Mr. Dawson concluded that the "before" value of the Garfield Building, which contained 145,778 square feet, was $43.5 million, or

**[\*36]** $298 per square foot.[15] That conclusion is preposterous in the light of the actual market evidence. We find the conclusion inescapable that Mr. Dawson dismissed the comparable sales method, not because no comparable sales data existed, but because the data were irreconcilable with the $298-per-square-foot "before" value he determined.[16]

In sum, petitioner has failed to show that correction of any errors in Mr. Brigden's analysis would generate a value above $6 million for the Garfield Building as of May 25, 2016. We accordingly find that its value before the granting of the easement was $6 million.[17]

### c. *Income Approach*

Dismissing the sales comparison approach, Messrs. Clark and Dawson employed the income approach—often called the "income capitalization" method—to determine the "before" value of the Garfield Building. The income method determines FMV by discounting to present value the expected future cashflows from the property. *See, e.g.*, *Chapman Glen*, 140 T.C. at 327; *Marine v. Commissioner*, 92 T.C. 958, 983 (1989), *aff'd*, 921 F.2d 280 (9th Cir. 1991) (unpublished table decision). The theory behind this approach is that an investor would be willing to pay no more than the present value of a property's anticipated future net income. *See Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010-283, 100 T.C.M. (CCH) 581, 583, *aff'd*, 493 F. App'x 944 (10th Cir. 2012).

---

[15] Mr. Brigden's appraisal assumed that the Garfield Building contained 150,905 square feet. Mr. Dawson's appraisal, which included Sandvick's concept plans, details a square footage of 145,788. This difference may be explained by the experts' different treatments of the eight associated parcels. *See supra* pp. 4, 7. For purposes of consistency, we use the square footage supposed by Mr. Dawson.

[16] Petitioner contends that the $298-per-square-foot figure is inaccurate because Mr. Dawson determined his $43.5 million "before" value on the assumption that the 34-story vertical addition had been completed. We find no merit in this argument. The "before" value is the price at which the property "would change hands between a willing buyer and a willing seller" before placement of the easement. Treas. Reg. § 1.170A-1(c)(2). The relevant inquiry is thus the price that a hypothetical willing buyer would pay to purchase the 145,778-square-foot Garfield Building, including the right to expand it upwards. By determining a "before" value of $43.5 million, Mr. Dawson necessarily concluded that the hypothetical willing buyer would pay $298 per square foot.

[17] The $6 million purchase price was paid for the Building itself and eight associated parcels. *See supra* pp. 4, 7. The record includes no evidence that would enable us to determine the size, precise location, or value of those eight parcels. We will accordingly treat the $6 million as being paid for the Building itself. Because the other parcels presumably had some value, this assumption favors petitioner.

**[\*37]** Messrs. Clark and Dawson posited that the HBU of the Garfield Building was conversion into a 45-story apartment complex via rehabilitation of the lower 11 floors and addition of a 34-story tower as envisioned in Sandvick's plans. They estimated the future income that might flow from rental of the hypothesized 547 apartments, used a DCF analysis to discount that projected income stream to present value, and subtracted from that figure the estimated costs of renovating the lower 11 floors and erecting the 34-story tower. Mr. Dawson concluded that the value of the Garfield Building before placement of the easement was $43.5 million, slightly below the $47.5 million "before" value determined by Mr. Clark.

We reject this approach for numerous reasons. First, the income capitalization method is most reliable when used to determine the value of an existing business, with a track record of growth, income, expenses, and profits. A historical track record of this sort provides a plausible basis for projecting future revenue. The income approach is rarely appropriate when seeking to determine the value of undeveloped property with no existing cashflow. *See, e.g.*, *Chapman Glen*, 140 T.C. at 327; *Whitehouse Hotel*, 139 T.C. at 324–25 (noting that the income approach "has been judged an unsatisfactory valuation method for property that does not have a track record of earnings" (quoting *Whitehouse Hotel*, 131 T.C. at 153)).

When the income approach is used, the Court must examine the plausibility of the critical assumptions made by the appraiser. *See Kiva Dunes Conservation, LLC v. Commissioner*, T.C. Memo. 2009-145, 97 T.C.M. (CCH) 1818, 1820. Each assumption, whether large or small, carries with it "some risk of error." *Whitehouse Hotel*, 139 T.C. at 323. As interdependent assumptions multiply, the risk of error can increase exponentially. We have therefore rejected an expert's use of the income method when "[o]ur own calculations . . . show that relatively minor changes in only a few of his assumptions would have large bottom-line effects." *Ibid*.

We have often noted "the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings." *Pittsburgh Terminal Corp v. Commissioner*, 60 T.C. 80, 89 (1973), *aff'd*, 50 F.2d 1400 (3d Cir. 1974) (unpublished table decision). Lacking reliable data, the appraiser would have to rely on a lengthy series of assumptions, estimates, and guesstimates. That problem would be at its apogee here: Erecting a 34-story tower on top of a 100-year-old "certified historic structure" would be an unusual and risky form of construction, the true

[*38] costs of which would be extremely hard to predict. Performed under these constraints, the DCF method becomes highly speculative, making it inferior to the sales comparison method, which draws its conclusions from the market. *See Ambassador Apartments*, 50 T.C. at 243–44 (rejecting real estate valuation premised on the income approach in favor of market value established by recent sales).

Second, we are not convinced that the HBU of the Garfield Building in May 2016 was conversion into a 45-story apartment complex. The HBU of vacant land or an improved property is "[t]he reasonably probable and legal use . . . that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Whitehouse Hotel*, 139 T.C. at 331 (quoting Appraisal Inst., *supra*, at 277). The strongest evidence that the addition of a 34-story tower was not "reasonably probable" is that Mr. Sinito and Millenia never seriously considered this use. *See supra* pp. 13–14. They were profit-maximizing real estate developers who were not in the habit of leaving money on the table. From the outset, the HBU they single-mindedly pursued was conversion of the Garfield Building into an 11-story apartment building, as set forth in the rehabilitation plan they submitted to the NPS and the State of Ohio.[18]

Mr. Brigden reasonably concluded that the difficulty and cost of a 34-story vertical expansion would drastically outweigh any plausible economic benefits. Neither the Garfield Building nor the land on which it was situated was "unique within its marketplace." Downtown Cleveland witnessed "numerous conversions of underutilized office spaces into residential apartment[s]" during 2016, and many of these buildings were no more than six stories high. There was "no shortage of alternate development sites," including empty lots and vacant commercial shells. Given the numerous opportunities for ground-up residential development in downtown Cleveland in May 2016, a prudent developer would not have risked the "significant challenge[s]" incident to erecting a

---

[18] Petitioner argues that Millenia's intent is "irrelevant" in determining the HBU of the Garfield Building, urging that "[t]he highest and best use inquiry is one of objective probabilities." *See Esgar Corp. v. Commissioner*, 744 F.3d 648, 657 (10th Cir. 2014), *aff'g* T.C. Memo. 2012-35, *and Temple v. Commissioner*, 136 T.C. 341 (2011); *Symington*, 87 T.C. at 897. Contrary to petitioner's view, the fact that a profit-maximizing real estate developer did not give serious consideration to the 34-story tower scheme supplies evidence that it was not an "objectively probable" development option. Conversely, Millenia's intended use—rehabilitation of the 11-story Building into residential apartments—is evidence of what a hypothetical buyer with similar expertise would have considered a reasonable and adaptable use.

[*39] 34-story tower on top of the Garfield Building. *Cf. Whitehouse Hotel*, 139 T.C. 335 (finding that that the taxpayer "failed to show that, on the valuation date, there was any scarcity of buildings . . . suitable for development as luxury hotels").[19]

Third, petitioner did not carry its burden of proving that the addition of a 34-story tower was physically possible in structural engineering and/or geotechnical terms. To support the feasibility of the 34-story vertical expansion scheme, Sandvick solicited a structural engineering report from Hach and a geotechnical report from Lewin. Hach's cover letter said: "Such a scheme is felt by the writer to be structurally feasible"—not exactly a ringing endorsement. Lewin was charged with testing the soil underneath the Garfield Building to ensure that it could support the weight of 34 additional floors of steel and concrete. But Lewin's report acknowledged that it had not actually tested the soil underneath the Garfield Building. Instead, it said that borehole samples taken from "previous investigations near the site" suggested that a 34-story tower could be supported.

The Lewin and Hach reports, like Sandvick's revised plans, were drafted after Corning Place had granted the easement over the Garfield Building. The easement prohibited vertical additions, so all participants knew that the 34-story addition would never be built. Because the three firms were addressing a purely theoretical proposition, they had no risk of liability if their opinions were poorly researched or ill founded.

Petitioner called no representative from Hach nor Lewin to testify at trial. The reports they supplied to Sandvick are hearsay documents, and we do not accept those documents as evidencing the truth of the matters addressed therein. *See United States v. Sims*, 514 F.2d 147, 149–50 (9th Cir. 1975) (ruling that hearsay material relied upon by an expert "is to be considered solely as a basis for the expert opinion and not as substantive evidence"). No witness at trial provided testimony to support the structural feasibility or physical possibility of adding a 34-story apartment tower on top of the Garfield Building.

---

[19] We also credited Mr. Brigden's testimony that the physical characteristics of the Garfield Building made vertical expansion "difficult if not impractical." The National Bank Building, situated next door, would have been adversely affected by any expansion effort, e.g., by inserting huge steel pillars into what is now the Marble Room restaurant. Mr. Brigden determined that these physical characteristics posed "significant challenge[s]" that made any expansion of the Garfield Building unlikely.

**[*40]** Fourth, petitioner failed to carry its burden of proving that the vertical expansion scheme was "financially feasible." Adding a 34-story tower on top of the Garfield Building would have required Millenia to forfeit the historic preservation tax credits—sold to BOA for $6.6 million—that were a critical piece of its financing for the rehabilitation. Moreover, neither Mr. Clark nor Mr. Dawson did any independent research to calculate the costs of constructing the 34-story tower. Rather, both relied solely on the $102,867,921 "cost estimate" that Sandvick had solicited from JERA. This was a one-page schedule of line items with no supporting explanation.

Petitioner called no representative from JERA as a witness at trial to explain how the costs shown on its one-page schedule were calculated. The supposed 34-story vertical addition was not a garden-variety construction project on a vacant lot, but a complex undertaking requiring the injection of 40+ steel support pillars into the fabric of a 100-year-old building. Mr. Brigden correctly noted that the Garfield Building was "one of the oldest steel structure buildings in Cleveland" and that the costs of adding a 34-story tower, which might require "additional structural reinforcement," were "speculative." The cost schedule furnished by JERA omitted several important costs, including architectural fees, landscaping costs, costs of storing construction equipment, contingency, and numerous other "soft costs." *See supra* p. 16. Petitioner adduced no testimony or other evidence at trial to establish that the costs shown on JERA's one-page schedule accurately captured the true costs of constructing the 34-story tower depicted in Sandvick's plans.[20]

Fifth, assuming arguendo that the HBU of the Garfield Building in May 2016 was conversion into a 45-story apartment complex, that would not change our determination that the "before" value of the property was $6 million. In January 2015 Millenia purchased the Building from Westcore for $6 million in an arm's-length transaction. In January 2015 the Building was, and in May 2016 it remained, a vacant commercial shell. By paying $6 million, Millenia acquired the right to develop that vacant shell into whatever it believed the property's "highest and best use" to be, including the right to exploit the air space above the Building by expanding it upward. Regardless of what the property's

---

[20] Mr. Dawson was aware that there would be "soft costs" associated with the proposed 34-story addition and that these costs could be significant. He testified that he had asked petitioner for all information on "soft costs" before starting his appraisal. But petitioner failed to provide him with any of the requested information.

**[\*41]** HBU might be thought to have been, the sale price upon which a knowledgeable willing buyer and a knowledgeable willing seller agreed was $6 million.

The HBU concept "is an element in the determination of fair market value." *Boltar*, 136 T.C. at 336. But it is simply one element. It does not supersede or eliminate the most important prerequisite in determining FMV, namely, that "a hypothetical willing buyer would purchase the subject property for the indicated value." *Ibid.*; *see* Treas. Reg. § 1.170A-1(c)(2). There is no evidence that Millenia (or anyone else) would have been willing to pay $43.5 million for the Garfield Building as a vacant commercial shell. Mr. Sinito testified that he would not have paid anything close to $43.5 million for the Garfield Building as it existed in May 2016. And if Westcore had believed that the air rights above the Building were worth anything like $22.6 million, it would not have sold the Building, including the air rights, for $6 million.

Finally, apart from these major problems, we note some additional, more technical, flaws in Mr. Dawson's DCF analysis:

- Mr. Dawson's DCF analysis assumed that the 45-floor structure hypothesized by Sandvick would be completed, and that occupancy would begin, eight months after the easement was donated. Petitioner supplied no evidence to show that this was a realistic assumption. Mr. Dawson did not address the time needed to secure mandatory approvals and permits, e.g., approval from the city planning commission, zoning approval, construction permits, and certificates of compliance with building codes. Ms. Dornback testified that preparation of final architectural and construction plans would take at least a year. And ignoring the risk of construction-related delays, the evidence indicated that it would have taken more than a year just to secure financing for the hypothetical $100 million project.

- Mr. Dawson provided no credible support for his conclusion that the downtown Cleveland market could absorb the 424 apartments that the 34-story tower would comprise, in addition to the 123 units already planned for 11 lower floors. The record indicated that at least 20 multifamily residential buildings had been added to the market since 2007, with several others under construction (or in the planning stages) as of May 2016. The projects then in process were projected to add more than 1,000 new apartments during the ensuing 18 months. In 2016 the downtown market

[*42] had a total inventory of 8,456 rental apartments. The 547 units Mr. Dawson contemplated would have represented 6.5% of that total inventory. We find it implausible that the market could have absorbed all these apartments as quickly and effortlessly as Mr. Dawson assumed.

- Mr. Dawson's DCF analysis assumed a 95% occupancy rate for the proposed 547-unit Building. But his own dataset showed that the actual occupancy rate in downtown Cleveland was much lower. The occupancy rate for rental apartments was projected to drop from 92.3% in 2016 to 87.6% in 2017 and to drop as low as 80% during 2018–2020. We were unpersuaded by Mr. Dawson's testimony that the Garfield Building would somehow be immune from this downward trend.

- Mr. Dawson assumed that the average rent per square foot for the hypothetical 45-story Building would be $1.95. But he derived that figure from rents charged by luxury buildings that offered much more in terms of amenities. For example, Mr. Dawson assumed that a 590-square-foot one-bedroom apartment in the Garfield Building would rent at $1.89 per square foot. But other buildings in downtown Cleveland that offered upscale one-bedroom apartments of that size were charging significantly lower rent, ranging from $1.25 to $1.70 per square foot. Mr. Brigden estimated overall rental proceeds at a much more realistic $1.49 per square foot.

## C.     *"After" Value of the Garfield Building*

The "before and after" method is designed to measure the diminution in value that is occasioned to real property from placement of a conservation easement. *See* Treas. Reg. § 1.170A-14(h)(3). On May 24, 2016—the day before the easement was granted—the Garfield Building was an empty 11-story commercial shell. We have determined that its value on that date was $6 million. On May 26, 2016—the day after the easement was granted—the Garfield Building was an empty 11-story commercial shell, but now encumbered by a conservation easement. We must decide the amount by which that encumbrance lessened the value of the property.

Petitioner introduced no expert testimony or other evidence that would be relevant in quantifying the diminution in value attributable to the easement. Quite the contrary: Mr. Dawson posited that the Garfield

[*43] Building after imposition of the easement was the original 11 stories as fully rehabilitated per the NPS-approved plan. Needless to say, that value had nothing to do with the value of the pre-rehabilitation, easement-encumbered, vacant commercial shell. Petitioner has thus submitted no evidence that would enable it to discharge its burden of proof.

Mr. Brigden conceded that the easement diminished the value of the Garfield Building. He acknowledged that the easement imposed an increased obligation to remediate "external obsolescence," including extra maintenance costs, insurance costs, and administrative costs that would need to be budgeted and effected by a competent manager. Using a sales comparison approach, he sought to determine the "after" value by considering sales of commercial buildings in downtown Cleveland that were encumbered by historic preservation easements. Having located six such sales, he selected three transactions that occurred between September 2014 and September 2015 involving properties near the Garfield Building with "reasonably similar" size and use.

After making various adjustments Mr. Brigden determined that the diminution in value attributable to the easement, under a sales comparison approach, was $760,000. Alternatively, he determined that the diminution in value attributable to the easement was $590,000 under a cost-based approach and $1,590,000 under an income-based approach. The average of these three figures is $980,000.

Given petitioner's failure to supply any relevant evidence, we will decide the "after" value by using the figures determined by Mr. Brigden. Rather than using a simple average of his results, we give greater weight to the sales comparison approach for the reasons discussed previously. *See supra* pp. 31–38. Acknowledging that valuation is not an exact science, we find that the diminution in value attributable to the easement was $900,000.

D.     *Valuation of the Easement*

We have determined that the "before" value of the Garfield Building was $6 million. We conclude that its "after" value—i.e., the value of the vacant commercial shell as encumbered by the easement—was $5.1 million, or $900,000 less than its "before" value. We accordingly hold that the value of the conservation easement when granted on May 25, 2016, was $900,000.

[*44] IV.     *Real Estate Loss*

On the return for its short taxable year beginning July 7 and ending December 31, 2016, Corning Place claimed a "net rental real estate loss" of $665,500. It filed that return as its "initial return" and checked the box stating that it was adopting the accrual method of accounting. On the attached Form 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation, it reported $665,500 of "easement expenses." It did not itemize these expenses on Form 8825, and it did not supply (on that Form or elsewhere on its return) any indication as to the nature or dollar amount of any particular expense.

Petitioner at trial likewise failed to supply evidence that would enable a comprehensive itemization of the reported $665,500 of "easement expenses." In its opening post-trial brief, it asserted that "the vast majority of the disputed expenses are fees payable to architects, engineers, and contractors" in connection with estimating the "lost development rights" from not building the 34-story apartment tower. In support of that assertion it referenced Exhibits 24-J, 25-J, and 28-J.

Exhibit 28-J is an engagement letter with JERA, dated February 16, 2017. Exhibit 24-J is an engagement letter with Mr. Clark, relating to the final appraisal he completed and delivered to Corning Place on August 5, 2017. Exhibit 25-J is an undated engagement letter in which Sandvick undertook to prepare detailed plans for the 34-story tower. Sandvick's fee for those plans was supposed to be $800,000, but the trial evidence suggested that Mr. Sinito negotiated that fee down to $528,000. Sandvick's engagement letter stated that payment would not be due until 30 days after Mr. Clark completed his final appraisal, which he finished on August 5, 2017.

Section 162(a) allows "as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Taxpayers have the burden of proof to substantiate any deductions claimed. *See INDOPCO*, 503 U.S. at 83–84; Treas. Reg. § 1.6001-1(a). None of the three Exhibits cited by petitioner establishes what portion (if any) of the claimed $665,500 of "easement expenses" was paid or incurred during Corning Place's short taxable year ending December 31, 2016. Because petitioner has failed to prove that any portion of the reported expenses was properly deductible for 2016 under the accrual method of accounting, we will sustain the Commissioner's disallowance of the $665,500 real estate loss deduction.

**[\*45]** V.     *Penalties*

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).

The value Corning Place claimed for the easement on its 2016 return was $22,601,000. We have determined that the value of the easement on the valuation date was only $900,000. The claimed value thus exceeded the correct value by $21,701,000, or 2,411%. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* § 6664(c)(3) (first sentence). The 40% penalty thus applies to the portion of Corning Place's underpayment attributable to claiming a value for the easement in excess of $900,000.

Respondent also seeks a 20% penalty for an underpayment due to negligence or a substantial understatement of income tax. *See* § 6662(a) and (b)(1) and (2). This penalty would apply to what might be called the "lower tranche" of the underpayment, i.e., the portion of the underpayment that was not attributable to a valuation misstatement. *See Oconee Landing Prop. v. Commissioner*, T.C. Memo. 2024-25, at \*75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, 122 T.C.M. (CCH) 343, 343). The 20% penalty would apply, in other words, to the portion of the underpayment resulting from our conclusions that Corning Place is entitled neither to a charitable contribution deduction of $900,000 (corresponding to the value we have determined for the easement) nor to a real estate loss deduction of $665,500.

The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax. *Plateau Holdings*, 122 T.C.M. (CCH) at 343.

**[\*46]** However, we can determine at the partnership level *the applicability* of the penalty. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Oconee Landing Prop.*, T.C. Memo. 2024-25, at \*75; *Plateau Holdings,* 122 T.C.M. (CCH) at 343.

The Code provides for an accuracy-related penalty equal to 20% of an underpayment attributable to a taxpayer's negligence or disregard of rules or regulations. § 6662(a) and (b)(1). The existence of negligence is determined at the partnership level. *See Oakbrook Land Holdings, LLC v. Commissioner*, T.C. Memo. 2020-54, 119 T.C.M. (CCH) 1351, 1360 (holding that the 20% penalty applies when a partnership takes a return position that is negligent); Treas. Reg. § 301.6221-1(c) (noting that assessment of any partnership item (and the applicability of any penalty) shall be determined at the partnership level). Negligence includes any failure "to keep adequate books and records or to substantiate items properly." Treas. Reg. § 1.6662-3(b)(1). Corning Place's failure to keep adequate records to substantiate the claimed "easement expenses" is prima facie evidence of negligence. *See id.* And we find that Corning Place was negligent by claiming the charitable contribution deduction on a return filed for a year post-dating the year in which the contribution was made.[21]

The "reasonable cause" defense may be asserted against the negligence and substantial understatement penalties. The determination of reasonable cause is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The partnership bears the burden of proving that it had reasonable cause

---

[21] Only one accuracy-related penalty may be *imposed* with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). *Sampson v. Commissioner*, T.C. Memo. 2013-212, 106 T.C.M. (CCH) 276, 278 (citing *New Phx. Sunrise Corp. v. Commissioner*, 132 T.C. 161, 187 (2009), *aff'd*, 408 F. App'x 908 (6th Cir. 2010)). However, this does not limit our ability to determine the *applicability* of more than one accuracy-related penalty at the partnership level. *See, e.g.*, *Triumph Mixed Use Invs. III, LLC v. Commissioner*, T.C. Memo. 2018-65, 115 T.C.M. (CCH) 1329, 1340 (finding in a partnership-level TEFRA proceeding that both the negligence penalty and the substantial understatement penalty applied). "Once a partnership-level proceeding is final, the liability of the partners, if any, may be determined in a partner-level proceeding, which may involve a computational adjustment or a notice of deficiency." *Dynamo*, 150 T.C. at 233 (citing § 6230(a)). We note that the disposition of this partnership-level proceeding does not preclude a partner's ability to raise a defense to penalties in that partner-level proceeding. *See id.* (citing Treas. Reg. § 301.6221-1).

[*47] and acted in good faith with respect to the underpayment. *See Higbee v. Commissioner*, 116 T.C. 438, 449 (2001).

Corning Place asserts reliance on professional advice as the basis for this defense. *See* Treas. Reg. § 1.6664-4(b)(1). Reliance on professional advice will absolve a taxpayer only if it establishes that it fully disclosed all relevant facts to the return preparer, that the errors on the return were "a result of the preparer's mistakes," and it actually relied on the preparer's advice in good faith. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002); *Estate of Goldman v. Commissioner*, 112 T.C. 317, 324 (1999), *aff'd sub nom. Schutter v. Commissioner*, 242 F.3d 390 (10th Cir. 2000) (unpublished table decision).

Corning Place contends that it reasonably relied on RSM, its tax return preparer, to claim the charitable contribution deduction on the correct tax return. We disagree. There is no evidence that RSM supplied an opinion, or other form of tax advice, that Corning Place's return for the taxable year beginning July 7, 2016, was the correct return on which to report the charitable contribution deduction. And whether or not the taxpayer has engaged a return preparer, it is obligated to review the return itself to ensure that the return has been prepared properly. *See United States v. Boyle*, 469 U.S. 241, 252 (1985); *Magill v. Commissioner*, 70 T.C. 465, 479–80 (1978) (holding that a taxpayer "still has a duty to read the return" even if all information was properly furnished to the preparer), *aff'd*, 651 F.2d 1233 (6th Cir. 1981).

The principals of Millenia and Corning Place were sophisticated real estate professionals. Even the most cursory review of Corning Place's return for the taxable year beginning July 7, 2016, would have made it obvious that the charitable contribution—made on May 25, 2016, as they well knew—was not made during that taxable year. In filing the return with that glaring error, Corning Place did not exercise ordinary business care and prudence. *See Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 662–63 (1987) (holding that a reliance on a tax preparer does not constitute reasonable cause if the taxpayer's review of the return should have revealed errors). And there is no evidence that Corning Place disclosed all relevant facts to RSM regarding its entitlement to the $665,500 deduction for easement-related expenses. We accordingly reject the reliance-on-professional-advice defense with respect to both of the disallowed deductions.

**[*48]** We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*